1  SAMUEL KORNHAUSER, Esq., California Bar No. 083528
2  LAW OFFICES OF SAMUEL KORNHAUSER
   155 Jackson Street, Suite 1807
3  San Francisco, California 94111
   Email: samuel.kornhauser@gmail.com
4  Telephone:    (415) 981-6281
   Facsimile:    (415) 981-7616

5  BRIAN DAVID, Esq., Illinois ARDC No. 0582468
6  LAW OFFICES OF BRIAN DAVID
   1329 North Dearborn Street
7  Chicago, Illinois 60610
   Email: bdbriandavid@gmail.com
8  Telephone:    (847) 778-7528
   Facsimile:    (312) 346-8469

9  Rafael Baella-Silva, Esq. Puerto Rico U.S.D.C. P.R. 124507
10 B & B LAW FIRM, PSC
   Baella & Baella
11 563 Pedro Bigay Street
   Urb Ext Baldrich
12 San Juan, Puerto Rico 00918
   Telephone: (787) 250-8080
13 Email: rbaellasilva@baellalaw.com

14 Attorneys for Plaintiff, Individually
   and on behalf of All Those Similarly Situated
15

16

17            **UNITED STATES DISTRICT COURT**

18              **DISTRICT OF PUERTO RICO**

19

20 DANIEL CONCEPCION,                   ) **Case No.**
   Individually and on Behalf of All Those )
21 Similarly Situated,                   )
                                         )
22                                       ) **CLASS ACTION COMPLAINT FOR**
                         Plaintiffs,     ) **VIOLATIONS OF ANTI-TRUST**
23                                       ) **LAWS; VIOLATIONS OF**
               v.                        ) **FEDERAL AND PUERTO RICO**
24                                       ) **WAGE AND HOUR LAWS;**
   OFFICE OF THE COMMISSIONER OF         ) **DECLARATORY RELIEF;**
25 BASEBALL, an unincorporated association ) **VIOLATION OF**
   doing business as MAJOR LEAGUE        ) **CONSTITUTIONAL RIGHT TO**
26 BASEBALL, ROB MANFRED; ALLAN          ) **EQUAL PROTECTION**
   HUBER "BUD" SELIG; KANSAS CITY        )
27 ROYALS BASEBALL CORP.;                )
   MIAMI MARLINS, L.P.; SAN FRANCISCO    ) **JURY TRIAL DEMANDED**
28 BASEBALL ASSOCIATES LLC; BOSTON       )
   RED SOX BASEBALL CLUB L.P.; ANGELS    )

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

BASEBALL LP; CHICAGO WHITE SOX          )
LTD.; ST. LOUIS CARDINALS, LLC;         )
COLORADO ROCKIES BASEBALL CLUB,         )
LTD.; BASEBALL CLUB OF SEATTLE, LLP; )
THE CINCINNATI REDS, LLC; HOUSTON       )
BASEBALL PARTNERS LLC; ATHLETICS        )
INVESTMENT GROUP, LLC; ROGERS           )
BLUE JAYS BASEBALL PARTNERSHIP;         )
CLEVELAND INDIANS BASEBALL CO.,         )
L.P.; CLEVELAND INDIANS BASEBALL        )
CO., INC.; PADRES L.P.; SAN DIEGO       )
PADRES BASEBALL CLUB, L.P.;             )
MINNESOTA TWINS, LLC; WASHINGTON        )
NATIONALS BASEBALL CLUB, LLC;           )
DETROIT TIGERS, INC.; LOS ANGELES       )
DODGERS, LLC; LOS ANGELES               )
DODGERS HOLDING CO.; STERLING           )
METS L.P.; ATLANTA NATIONAL             )
LEAGUE BASEBALL CLUB, INC.; AZPB        )
L.P.; BALTIMORE ORIOLES, INC.;          )
BALTIMORE ORIOLES, L.P.; THE            )
PHILLIES L.P.; PITTSBURGH BASEBALL,     )
INC.; PITTSBURGH BASEBALL P'SHIP;       )
NEW YORK YANKEES P'SHIP; TAMPA          )
BAY RAYS BASEBALL LTD.; RANGERS         )
BASEBALL EXPRESS, LLC; RANGERS          )
BASEBALL, LLC; CHICAGO BASEBALL         )
HOLDINGS, LLC; MILWAUKEE BREWERS        )
BASEBALL CLUB, INC.; MILWAUKEE          )
BREWERS BASEBALL CLUB, L.P.,            )
                                        )

Defendants.

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

**TABLE OF CONTENTS**

## Contents

**I.      BACKGROUND**.................................................................................**3**

    **I.      The Business of MLB** ........................................................ 4

    **III.    The Illegal Minor League Salaries** .................................. 7

**II.     PARTIES**.......................................................................................**10**

    **1.      Plaintiffs**.......................................................................... 10

    **2.      Defendants** ...................................................................... 10

**III.    CLASS ACTION ALLEGATIONS** ..............................................**18**

**IV.     FACTUAL ALLEGATIONS** ........................................................**18**

**Count 1: Federal Antitrust Violations** .................................................**18**

**I.      NATURE AND BACKGROUND OF FEDERAL ANTI-TRUST
        CLAIMS** .......................................................................................**19**

**III.    ANTITRUST CLASS ACTION ALLEGATIONS**...........................**21**

**V.      FACTUAL ALLEGATIONS** ........................................................**24**

    **II.     The Business of MLB** ...................................................... 24

    **III.    Minor Leaguers' Uniform, Adhesive Contracts** ................. 25

    **III.    The Antitrust Exemption for the "Business of Baseball"** ...... 33

    **IV.     Plaintiff and the Class Have Suffered Antitrust Injury –
        Damages for    Violation of Section 1 of the Sherman Act** .............. 36

**Count 2: Damages for Violation of the Sherman Act 15 U.S.C. § 2** .........**39**

**Count 3: Injunctive Relief - Violation of Sections 1 and 2 of The Sherman Act** .......**40**

**Count 4: Declaratory Relief - Curt Flood Act** ......................................**41**

**Count 5: Declaratory Relief - Sherman Act** .........................................**42**

**FEDERAL WAGE AND HOUR VIOLATIONS** .....................................**43**

**Count 6: FLSA Minimum Wage and Overtime Violations** .....................**43**

**IV.     FLSA COLLECTIVE ACTION ALLEGATIONS** ..........................**45**

**V.      JURISDICTION, VENUE, AND COMMERCE**..............................**46**

**Count 7: FLSA Record Keeping Requirements** ................................................**49**

**VIII.   PUERTO RICO WAGE AND HOUR VIOLATIONS** ......................................**49**

**Count 8: Puerto Rico Minimum Wage Violations**................................................**50**

**Count 9: Puerto Rico Unpaid Overtime Violations**................................................**52**

**IX. PRAYER FOR RELIEF**................................................................**53**

**X.      DEMAND FOR JURY TRIAL** ................................................................**57**

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

This class action is brought by Plaintiff, Daniel Concepcion, individually and all those similarly situated minor league baseball players ("minor leaguers"), on behalf of himself and the classes of minor leaguers he represents, against the defendants, the monopsony cartel of 30 major league baseball clubs and the Commissioner of Major League Baseball (collectively "MLB"), for violations of the Sherman Act 15 U.S.C. §§1 and 2  and violations of the Fair Labor Standards Act ("FLSA"), Puerto Rico wage and labor laws, and declaratory and injunctive relief for violations of the equal protection clause of the Fifth Amendment of the United States Constitution.

Plaintiffs allege as follows:

## I.     BACKGROUND

1.      The Defendants [1] are individual members of the monopsony cartel known as Major League Baseball ("MLB").

2.      MLB and each of the 30 individual, separately owned teams admittedly openly collude to restrict and depress, at below market rates, the wages and compensation they pay their minor league players ("the Class").

3.      MLB routinely colludes to violate federal and Puerto Rico wage and hour laws and to violate federal anti-trust laws to suppress, below market value, the compensation and wages the Class receive for their work as minor league baseball players.

4.      In order to monopolize minor league players, and restrain and depress minor league players' salaries and to violate the FLSA and Puerto Rico's minimum wage and labor laws, the MLB cartel inserted a provision (known as the reserve clause) into players' contracts that allows teams to retain the contractual rights to players and restricts their movement and their ability to negotiate with other teams for their baseball services and the compensation they receive, which reserve clause preserves MLB's monopsony over the minor league system of

---

[1] The term "Defendants" refers to the 30 Major League Team defendants named in this Complaint.

artificially low compensation paid to minor league players and their nonexistent contractual mobility. In order to restrain trade and competition in the relevant market for minor league players, the 30 independent, major league baseball teams have annually illegally entered into agreements between themselves, to set at non-competitive, below market, depressed rates, the wages and compensation they have paid and will pay their minor league players.

5.      Defendants' conspiracy and agreement to restrain trade in the market for the employment of minor league baseball players has had an adverse effect on interstate commerce in Puerto Rico and nationwide by lowering the compensation minor leaguers receive and spend throughout the United States.

## I.   The Business of MLB

6.      MLB is big business. Its games are broadcast throughout the United States. During the 2019 season, over 68.5 million fans paid to attend MLB games. MLB revenues exceeded $12.4 Billion, and the average value of an MLB team exceeded $2 Billion. MLB national television revenues were $1.84 Billion and local television revenues were $2.1 Billion.

7.      In 2020, over 40 million fans paid to attend minor league games throughout the United States played by 160 minor league teams and over 6,000 minor league players.

8.      The MLB teams acquire minor leaguers in one of two ways: through an amateur draft or through free agency.

9.      In 1965, Commissioner Ford Frick oversaw the development and implementation of what is now the Rule 4 draft. By forcing amateur players to participate in the draft, MLB and its Commissioner limited those players seeking to enter MLB's developmental system to only negotiating with the single team that drafted that player. Mr. Manfred has continued to employ those practices since becoming Commissioner in 2014.

10.      MLB's current Rule 4 draft, as developed and enforced by the Commissioner, requires all amateur players from Puerto Rico, the United States, Mexico and Canada to

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

participate in the draft in order to sign with an MLB team.[2] Beginning with the worst MLB team from the previous season, teams select previously amateur players over the course of forty rounds.

11.     Players selected in the Rule 4 draft are between the ages of 18 and 22 (with the exception of a few players who are 23). Once selected by a Franchise, a player cannot bargain with any other Franchise, as MLB's rules grant the drafting Franchise exclusive rights to the player.[3]

12.     All MLB teams acquire players from Puerto Rico through the draft and acquire other Latin American players from the Dominican Republic and Venezuela through "free agency". MLB rules allow the Franchises to sign the players as early as age sixteen, so most Latinos are either sixteen or seventeen when signing with a Franchise.[4]

13.     Many Latino minor leaguers come from poor families and have only the equivalent of an eighth-grade education. Before signing, many are only represented by similarly-educated "buscones"—usually former players who maintain training facilities for young amateur players. Some of the Franchises' scouts have been reprimanded in recent years for participating in bribes and kickback schemes with the buscones, and the FBI has even investigated the exploitative practices.[5] These Latino signees comprise over forty percent of minor leaguers.

14.     Similar to the slotting system, Mr. Selig also personally oversaw the development of bonus pools for Latino players in an effort to curtail Latino signing bonuses. Instituted in 2012, Mr. Selig's plan allows each Franchise a certain amount to spend on signing

---

[2] MLR 4(a).

[3] MLR 4(e).

[4] *See* MLR 3(a).

[5] *See* Jorge L. Ortiz, *Exploitation, steroids hitting home in Dominican Republic*, USA Today (Mar. 26, 2009), http://usatoday30.usatoday.com/sports/baseball/2009-03-26-dominican-republic-cover_N.htm.

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

bonuses for Latino players. Mr. Manfred has continued these practices.

15.     MLB rules, as implemented and enforced and renewed and adopted annually by the Defendants and the Commissioner, require all teams to use the same uniform player contract ("UPC") when signing these previously amateur players. MLR 3(b)(2) states:

> To preserve morale among Minor League players and to produce the similarity of conditions necessary for keen competition, all contracts…shall be in the form of the Minor League Uniform Player Contract that is appended to these Rules as Attachment 3. All Minor League Uniform Player Contracts between either a Major or a Minor League Club and a player who has not previously signed a contract with a Major or Minor League Club shall be for a term of seven Minor League playing seasons…. The minimum salary in each season covered by a Minor League Uniform Player Contract shall be the minimum amount established from time to time by the Major League Clubs….

16.     Moreover, "[a]ll contracts shall be in duplicate," and "[a]ll…must be filed with the Commissioner…for approval."[6] No contract can vary any term without the approval of the Commissioner.[7] A minor leaguer cannot work for an MLB team without signing the UPC because a "player's refusal to sign a formal contract shall disqualify the player from playing with the contracting Club or entering the service of any Major or Minor League Club."[8]

17.     Thus, the UPC grants the MLB team the exclusive rights to the minor leaguer for seven championship seasons (about seven years).[9] During that time period, the MLB team may assign the minor leaguer's rights to any other team, and the MLB team may terminate the agreement at any time for almost any reason.[10]

18.     But the minor leaguer cannot leave voluntarily to play for another baseball team—even outside of MLB, and even outside of the United States.[11] A player doing so "shall

---

[6] MLR 3(b)(3); *see also* MLR 3(b)(4) (saying that a player cannot play until the UPC is signed).

[7] MLR 3(b)(3).

[8] MLR 3(d).

[9] MLR 3(b)(2); MLR Attachment 3, UPC ¶ VI.A.

[10] MLR 9; MLR Attachment 3, UPC ¶ XVIII.

[11] MLR 18; MLR Attachment 3, UPC ¶ XVI.

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

be subject to the discipline of the Commissioner."[12] Retirement from baseball during the seven-year term even requires the Commissioner's approval.[13]

19.     The UPC traps a player in the minor leagues of a single organization. A minor leaguer selected in the amateur draft can only sign with the MLB team that drafted him. For the next seven years, the MLB team controls the minor leaguer's rights. By the expiration of the contract, much of the value of the minor leaguer as a young prospect has expired because the player has aged.

20.     MLB rules make clear that MLB and each of its 30 teams are the employers of minor leaguers at all times.

21.     MLB requires that each defendant team pay the salaries of its minor league players at all times and allows each defendant the ability to control each of its minor leaguer's assignments.[14]

### III.     The Illegal Minor League Salaries

22.     Since minor leaguers do not belong to a union, nothing has prevented the Defendants from artificially and illegally depressing minor league wages. Given that MLB carefully controls the entryway into the highest levels of baseball and given the young minor leaguer's strong desire to enter the industry, MLB and the Defendants have exploited minor leaguers by paying anti-competitive, fixed salaries below minimum wage, by not paying overtime wages, and by often paying no wages at all.

23.     Plaintiff is informed and believes that MLB and the Commissioner issue minor league salary "guidelines" which are anti-competitive and fixed and which each defendant team agrees to and is required to pay for players signed to an initial UPC, and teams cannot deviate

---

[12] MLR 18.

[13] MLR 14.
[14] MLR 56(g).

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

from these "guidelines". MLR 3(c) requires that all first-year minor leaguers earn "the amount established by" MLB.[15] It is currently believed that all first-year minor leaguers employed by the Defendants must be paid $1,100 per month.

24.     Salaries beyond the first year are also fixed and similar across all Franchises. It is believed that discussions regarding minor league salaries (and other working conditions concerning minor leaguers) occur when MLB hosts its quarterly owner meetings that all Defendants attend.

25.     While salary guidelines are not publicly available, the Plaintiffs are informed and believe, based on the salaries paid by the Defendants across the minor leagues, that MLB currently imposes the following salaries: less than $12,000 per year for Rookie and Short Season Class A; $12,400 per year for Class A; $14,400 per year for Class AA; and $16,800 per year for Class AAA.

26.     Beyond the first year, the UPC required by MLB, and previously enforced by Mr. Selig, and now enforced by Mr. Manfred, purports to allow salary negotiation by the minor leaguer, as the UPC states that salaries will be set out in an addendum to the UPC and subject to negotiation.[16] But the same UPC provision states that if the Franchise and minor leaguer do not agree on salary terms, the Franchise may unilaterally set the salary and the minor leaguer must agree to it.[17]

27.     The UPC required by MLB, formerly enforced by Mr. Selig, and now, by Mr. Manfred, further states that salaries are only to be paid during the championship season, which lasts about five months out of the year. [18] Plaintiffs believe that most minor leaguers currently earn less than $16,000 per calendar year, and earned much less in prior years during the class

---

[15] As the 2013 Miami Marlins Minor League Player Guide states, "all first-year players receive $1,100 per month regardless of playing level per the terms of the [UPC]."

[16] MLR Attachment 3, UPC ¶ VII.A.

[17] MLR Attachment 3, UPC ¶ VII.A.

[18] MLR Attachment 3, UPC ¶ VII.B. ("Obligation to make such payments to Player shall start with the beginning of Club's championship playing season…[and] end with the termination of Club's championship playing season….").

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

period. Despite only being compensated during the approximately five-month championship season, MLB's UPC "obligates minor leaguers to perform professional services on a calendar year basis, regardless of the fact that salary payments are to be made only during the actual championship playing season." [19] Consistent with that obligation, the UPC states that "Player therefore understands and agrees that Player's duties and obligations under this Minor League Uniform Player Contract continue in full force throughout the calendar year."

28.     MLB's UPC, and the Defendants' application of the UPC, requires the minor leaguer to participate in spring training.[20] Again, the UPC does not allow for salaries during this period since spring training falls outside the championship season, so minor leaguers work without earning a paycheck. The spring training season usually lasts around one month, during the month of March, but it sometimes lasts longer.

29.     In sum, the Defendants, as formerly directed by Mr. Selig, and now, by Mr. Manfred, have conspired and agreed among themselves to eliminate competition for the acquisition and payment of minor league baseball players at non-competitive, below market value wages (wage fixing) in violation of federal antitrust laws. (15 U.S.C. §§1 and 2) They have also conspired to and have and do pay illegally low wages during the championship season, no overtime wages, and no wages for work performed outside the championship season in violation of the federal Fair Labor Standards Act ("FLSA") 29 U.S.C. §§ 201 et seq. and Puerto Rico's minimum wage laws.

30.     Defendants have conspired to and lobbied Congress to pass unconstitutional laws specifically targeting minor league players for unequal treatment, i.e., the Curt Flood Act 15 U.S.C. §26b(b)(1), (2), specifically designed to discriminate against and deprive minor leaguers of their right to equal protection of the antitrust laws in violation of their strictly construed  Fifth Amendment constitutional rights to equal protection of the federal antitrust

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

---

[19] MLR Attachment 3, UPC ¶ VI.B.

[20] *See* MLR Attachment 3, UPC ¶ VI.B. (saying that the UPC applies to the "Club's training season").

laws or, in the alternative, with no rational basis for doing so. The Curt Flood Act provides in pertinent part:

> This section does not create, permit, or imply a cause of action by which to challenge under the antitrust laws . . . (1) any conduct, acts, practices, agreements . . . relating to . . . employment to play baseball at the minor league level . . .

Defendants have also coerced and misled Congress to pass the so-called Save America's Pastime Act (29 U.S.C. §213(a)(19)) to discriminate against and deprive minor league players of their constitutional right to equal protection of federal fair labor and minimum wage laws.

## II.   PARTIES

### 1.   Plaintiffs

Plaintiff and class representative, Daniel Concepcion, is a former minor leaguer who was in the Kansas Royals' organization from 2010 through 2012. Mr. Concepcion is a covered employee under the FLSA and under the Puerto Rico wage and hour laws. Mr. Concepcion worked in and played minor league baseball for the Kansas Royals' organization in Idaho, North Carolina and Kentucky. He is a representative plaintiff on behalf of all current and former minor leaguers from 2012 through final judgment or settlement in this case on their antitrust violation claims, the FLSA claims, their declaratory relief and equal protection claims.

### 2.   Defendants

31.   **The Office of the Commissioner of Baseball, d/b/a MLB.** The Office of the Commissioner of Baseball, doing business as MLB, is an unincorporated association comprised of the thirty Major League baseball clubs ("the Franchises"). [21] MLB has unified operation and

---

[21] *See* Exhibit B, Major League Constitution ("MLC"), Art. II § 1.

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

common control over the Franchises. All do business as MLB.

32.     Under the broad meaning of "employ" used by the FLSA and the applicable state laws, MLB employed (and/or continues to employ) Plaintiffs, all similarly situated employees, and all employees of the proposed classes. As described more thoroughly below, the Defendants' cartel has developed a unified constitution and unified rules to closely control many fundamental aspects of the minor leaguers' employment, including, *inter alia*, hiring, contracts, wages, periods of wage payment and nonpayment, other working conditions, and control over the minor leaguers before, during, and after the championship season.

33.     **Allan Huber "Bud" Selig.** Since 1998, Allan Huber "Bud" Selig served as the Commissioner of Baseball. He committed some of the FLSA and federal anti-trust violations alleged herein.

34.     On August 14, 2014, **Robert D. Manfred, Jr.** took over as Commissioner of Baseball and continued to this day the FLSA and federal anti-trust violations alleged herein.

35.     The Commissioner is the "Chief Executive Officer of Major League Baseball." [22] Serving in this capacity, Mr. Selig had, and Mr. Manfred continues to exercise the power to, among other things, discipline players, announce rules and procedures, preside over meetings, [23] and suppress wages at below market, non-competitive levels for minor leaguers.

36.     Mr. Selig had, and Mr. Manfred now also has "executive responsibility for labor relations," [24] meaning that Mr. Selig was, and Mr. Manfred now is the chief bargaining agent for the owners during negotiations with the major league union.

37.     Since Mr. Selig oversaw and Mr. Manfred now oversees all labor matters, Mr. Selig

---

[22] MLC Art. II § 2.

[23] MLC Art. II §§ 2, 3.

[24] MLC Art. II § 2.

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

was, and Mr. Manfred now is also (collectively they were and now are) the chief agent for the owners when it comes to forming labor practices involving minor leaguers. Moreover, Mr. Selig did, and Mr. Manfred now implements, enforces, and often directs the development of MLB's rules, guidelines, and policies concerning the employment of minor league players.

38.     Mr. Selig did, and Mr. Manfred now serves as MLB's agent in numerous other areas. For instance, Mr. Selig serves as "the fiscal agent of the Major League Central Fund"; has the power to "negotiate and enter into settlement agreements" for nationwide broadcasting rights; can receive funds "made payable to the Commissioner as agent for the Clubs"; and can even invest central funds on behalf of the Defendants. [25]

39.     The MLB owners elect the Commissioner of Baseball by a vote. [26] They also pay the Commissioner's salary. [27]

40.     Under the broad meaning of "employ" and "employer" used by the FLSA and applicable state laws, Mr. Selig and Mr. Manfred, as the chief executive, can be and in this case is, jointly and severally liable, along with the MLB defendants, for their violations of FLSA, Puerto Rico's and applicable state labor laws and federal anti-trust violations. The Commissioner oversees and closely controls many aspects central to the minor leaguers' employment, including, *inter alia*, hiring, contract terms, discipline, and firing, setting the amount of wages, on-field work rules, and when wages are to be paid. [28]

---

[25] MLC Art. X; *see also* MLR 30 (saying that all funds in the hands of the Commissioner are joint funds of the MLB Clubs).

[26] MLC Art. II §§ 8, 9.

[27] MLC Art. II § 8.

[28] *See* MLR Attachment 3, Minor League Uniform Player Contract ("UPC") ¶¶ VI (describing the conditions of employment), VII (payment of salaries), XXIII (granting Commissioner right to suspend the contract), XXVI (requiring approval by the Commissioner for the contract to have effect); *see also, e.g.*, Addendum C to MLR Attachment 3 (salary form requiring approval by the Commissioner); MLR 4 (giving Commissioner power to oversee the amateur draft, one of the chief avenues of hiring players); MLR 13 (giving Commissioner the power to suspend players); MLR 3(e) (requiring all contracts to be approved by the Commissioner); MLR 14 (giving Commissioner the power to accept or deny an application for retirement); MLR 15 (giving Commissioner power to place players on an Ineligible List for misconduct, or to take any other disciplinary action in the best interest of baseball).

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

41.     Upon information and belief, the Commissioner also had and has direct involvement in the formation of programs affecting working conditions for minor leaguers, such as the implementation of a system to suppress signing bonuses for minor leaguers entering MLB's developmental system for the first time.

42.     **Franchise Defendants.** The below named MLB franchises are defendants in this lawsuit and referred to collectively as the "Franchise Defendants":

43.     *Kansas City Royals.* Kansas City Royals Baseball Corp. (d/b/a "Kansas City Royals") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Kansas City Royals employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

44.     *Miami Marlins.* Miami Marlins, L.P. (d/b/a "Miami Marlins") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Miami Marlins employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes. The Miami Marlins were known and operated as the Florida Marlins until changing its name in 2012. Plaintiffs are informed and believe that the Miami Marlins is the successor in interest to the Florida Marlins franchise.

45.     *San Francisco Giants*. San Francisco Baseball Associates LLC (d/b/a "San Francisco Giants") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the San Francisco Giants employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

46.     *Boston Red Sox.* Boston Red Sox Baseball Club L.P. (d/b/a "Boston Red Sox") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Red Sox of baseball).employed (and/or continue to employ) Plaintiffs, similarly situated employees, and/or employees of the Proposed Classes.

47.      *Toronto Blue Jays.* Rogers Blue Jays Baseball Partnership (d/b/a "Toronto Blue Jays") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Toronto Blue Jays employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

48.      *Chicago White Sox.* Chicago White Sox Ltd. (d/b/a "Chicago White Sox") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Chicago White Sox employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

49.      *Cleveland Indians.* Cleveland Indians Baseball Co., L.P., and Cleveland Indians Baseball Co, Inc., (d/b/a "Cleveland Indians") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Cleveland Indians employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

50.      *Houston Astros.* Houston Baseball Partners LLC (d/b/a "Houston Astros") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Houston Astros employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

51.      *Los Angeles Angels of Anaheim.* Angels Baseball LP (d/b/a "Los Angeles Angels of Anaheim") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Los Angeles Angels of Anaheim employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

52.      *Oakland Athletics.* Athletics Investment Group, LLC (d/b/a "Oakland Athletics") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Oakland Athletics employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

53.      *Seattle Mariners.* Baseball Club of Seattle, LLP (d/b/a "Seattle Mariners") is an

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Seattle Mariners employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

54.     *Cincinnati Reds.* The Cincinnati Reds, LLC (d/b/a "Cincinnati Reds") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Cincinnati Reds employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

55.     *St. Louis Cardinals.* St. Louis Cardinals, LLC (d/b/a "St. Louis Cardinals") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the St. Louis Cardinals employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

56.     *Colorado Rockies.* Colorado Rockies Baseball Club, Ltd. (d/b/a "Colorado Rockies") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Colorado Rockies employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

57.     *San Diego Padres.* Padres L.P., and the San Diego Padres Baseball Club, L.P. (d/b/a "San Diego Padres") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the San Diego Padres employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

58.     *Minnesota Twins.* Minnesota Twins, LLC (d/b/a "Minnesota Twins") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Minnesota Twins employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

59.     *Washington Nationals.* Washington Nationals Baseball Club, LLC (d/b/a "Washington Nationals") is an MLB Franchise. As a member of Major League Baseball, acting

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

jointly and on its own behalf, the Washington Nationals employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

60.     *Detroit Tigers.* Detroit Tigers, Inc. (d/b/a "Detroit Tigers") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Detroit Tigers employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

61.     *Los Angeles Dodgers.* Los Angeles Dodgers, LLC, and Los Angeles Dodgers Holding Co., (d/b/a "Los Angeles Dodgers") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Los Angeles Dodgers employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

62.     *New York Mets.* Sterling Mets L.P. (d/b/a "New York Mets") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the New York Mets employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

63.     *Atlanta Braves.* Atlanta National League Baseball Club, Inc. (d/b/a "Atlanta Braves") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Atlanta Braves employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

64.     *Arizona Diamondbacks.* AZPB L.P. (d/b/a "Arizona Diamondbacks") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Arizona Diamondbacks employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

65.     *Baltimore Orioles.* Baltimore Orioles, Inc., and Baltimore Orioles, L.P., (d/b/a "Baltimore Orioles") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Baltimore Orioles employed (and/or continue to employ) Plaintiffs,

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

similarly situated employees, and employees of the Proposed Classes.

66. *Philadelphia Phillies.* The Phillies L.P. (d/b/a "Philadelphia Phillies") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Philadelphia Phillies employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

67. *Pittsburgh Pirates.* Pittsburgh Baseball, Inc., and Pittsburgh Baseball P'ship, (d/b/a "Pittsburgh Pirates") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Pittsburgh Pirates employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

68. *New York Yankees.* New York Yankees Partnership (d/b/a "New York Yankees") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the New York Yankees employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

69. *Tampa Bay Rays.* Tampa Bay Rays Baseball Ltd. (d/b/a "Tampa Bay Rays") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Tampa Bay Rays employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

70. *Chicago Cubs.* Chicago Baseball Holdings, LLC (d/b/a "Chicago Cubs") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Chicago Cubs employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

71. *Milwaukee Brewers.* Milwaukee Brewers Baseball Club, Inc., and Milwaukee Brewers Baseball Club, L.P., (d/b/a "Milwaukee Brewers") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Milwaukee Brewers employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed

Classes.

72.     *Texas Rangers.* Rangers Baseball Express, LLC, and Rangers Baseball, LLC, (d/b/a "Texas Rangers") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Texas Rangers employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Proposed Classes.

## III.     CLASS ACTION ALLEGATIONS

73.     Plaintiff brings the Puerto Rico labor law class action claims, Counts 8 and 9, as class actions under Rule 23(a) and Rule 23(b)(1), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of himself and all others similarly situated. The Puerto Rico class is as follows:

74.     **Puerto Rico Class.** For Counts 8 and 9 (violations of Puerto Rico's wage and labor laws), the Puerto Rico Class is defined as follows: all minor leaguers who were, at all applicable times, citizens and residents of Puerto Rico and were employed by Defendants under uniform player contracts ("UPC") who worked, will work, and/or continue to work as minor leaguers and signed UPC contracts in and/or were paid in Puerto Rico for any MLB minor league team and performed work for such team, at any time between January 1, 2012 and the final resolution of this action. Excluded from the Puerto Rico Class are Defendants and their officers, directors, assigns, and successors, or any individual who has, or who at any time during the class period has had, a controlling interest in Defendants. Also excluded are the Court and any members of the Court's immediate family, counsel for plaintiffs, as well as persons who submit timely and proper requests for exclusion from the Puerto Rico Class.

## IV.     FACTUAL ALLEGATIONS
### Count 1: Federal Antitrust Violations

75.     Plaintiffs re-allege and incorporate by reference as though fully set forth herein Paragraphs 1-74 above.

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

76.     This federal antitrust class action is brought by Plaintiffs, minor league baseball players ("minor leaguers"), on behalf of themselves and the class of minor leaguers they represent, against all of the above-named defendants, the cartel of 30 major league baseball clubs and the Commissioner of Major League Baseball (collectively "MLB"), for violations of the Sherman Act and Clayton Act ("federal antitrust laws").

## I.     NATURE AND BACKGROUND OF FEDERAL ANTI-TRUST CLAIMS

77.     The Defendants are either members of or govern the monopsony cartel known as Major League Baseball ("MLB").

78.     MLB openly colludes on the working conditions for the development of its chief commodity: minor league professional baseball players ("minor leaguers"). MLB routinely colludes to violate federal antitrust laws.

79.     In order to monopolize minor leaguers, restrain and depress minor league players' salaries, the MLB cartel inserted a provision (known as the reserve clause) into players' contracts that allows teams to retain for seven (7) years the contractual rights to players and restrict their ability to negotiate with other teams for their baseball services, which reserve clause preserves MLB's minor league system of artificially low salaries and nonexistent contractual mobility.

80.     Unlike major leaguers, minor leaguers have no union or collective bargaining agreement, even though they comprise the overwhelming majority of baseball players employed by the Defendants. The Major League Baseball Players' Association ("MLBPA") does not represent the interests of minor leaguers.

81.     Efforts to unionize minor leaguers have been unsuccessful because minor leaguers fear retaliation by the Defendants. Minor leaguers are afraid to challenge the MLB-imposed wage system, for fear it would jeopardize their careers and potential to become major leaguers if they challenged the system.

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

82.     Minor leaguers are powerless to combat the collusive power of the MLB cartel. MLB continues to actively and openly collude on many aspects of minor leaguers' working conditions, including, but not limited to, wages, contract terms, and their ability to work for and negotiate with other teams.

83.     The federal antitrust laws were enacted to protect competition and prevent conspiracies to restrain competition, including competition for employment, group boycotts, and monopolization.

84.     Through their collective exercise of monopsony power and restraint of trade in the minor league professional baseball player market, Defendants have eliminated competition and suppressed minor leaguers' compensation, in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. Most minor leaguers earn less than $12,000 for the entire year, despite routinely working between 50 and 70 hours per week during the roughly five-month championship season. They receive no overtime pay, and instead, routinely receive less than minimum wage during the championship season.

85.     The Defendants have conspired to pay no wages at all for significant periods of minor leaguers' work. The Defendants do not pay minor leaguers their salaries during spring training, even though the Defendants require minor leaguers to often work over fifty hours per week during spring training. Similarly, the Defendants do not pay salaries during other training periods such as instructional leagues and winter training. [29]

86.     This suit seeks to recoup the damages sustained by minor leaguers as a result of MLB's violations of the antitrust laws, 15 U.S.C. §§ 1, 2, and 15. It seeks to recover damages through a class action on behalf of minor league professional baseball players to recover treble the shortfall in underpaid compensation they should have received absent Defendants' antitrust violations.

---

[29] *See* Exhibit A attached hereto and incorporated herein, Major League Rules ("MLR") Attachment 3, UPC ¶ VII, B; ¶ VI, B.

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

87.     This suit also seeks to enjoin Defendants from continuing their antitrust violations.

## III.   ANTITRUST CLASS ACTION ALLEGATIONS

88.     Plaintiffs bring their antitrust claims as a class action under Rule 23(a) and Rule 23(b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and all other minor league professional baseball players similarly situated. The class is defined as follows:

> All minor leaguers employed by Defendants under uniform player contracts ("UPC") who worked, will work, and/or continues to work as minor leaguers for any minor league team affiliated with a Franchise Defendant at any time between January 1, 2012 and the final resolution of this action. Excluded from the Class are Defendants and their officers, directors, assigns, and successors, or any individual who has, or who at any time during the class period has had, a controlling interest in Defendants. Also excluded are the Court and any members of the Court's immediate family, counsel for plaintiffs, as well as persons who submit timely and proper requests for exclusion from the Class.

89.     The Class Representative is Daniel Concepcion.

90.     The Proposed Class, consisting of thousands of similarly situated, geographically dispersed minor leaguers, is so numerous that it makes joinder of all members impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs are informed and believe that it is in the thousands.

91.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the members of the Class were and are subject to the same or similar artificially depressed compensation practices arising out of Defendants' conspiracy to restrain competition and depress compensation paid to minor league players, in violation of the federal antitrust laws as alleged herein. Plaintiff and the Class have sustained similar types of damages, i.e.,

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

reduced compensation, as a result of Defendants' antitrust violations.

92.     Plaintiff will fairly and adequately protect the interests of all members of the Class because they possess the same interests and suffered the same types of damages (depressed compensation) as the other class members. Plaintiff has retained counsel competent and experienced in class action litigation, including antitrust litigation.

93.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual members of the Class, including:

(a) whether Defendants conspired or agreed to force all minor league players to sign uniform player contracts with uniform wage fixed compensation which assigned them to one major league franchise for seven (7) years and prevented them from negotiating or contracting with other competing franchises for competitive, non-wage-fixed compensation for their baseball services, in violation of 15 U.S.C. §§1 and 2;

(b) whether Defendants' imposition of the so called "reserve clause", which prevents minor league baseball players from negotiating or contracting with other teams for their services is a violation of 15 U.S.C. § 1 and/or 2;

(c) whether Defendants conspired to require all minor leaguers to sign the same UPC, which controls and depresses minor leaguers' pay in violation of the antitrust laws;

(d) whether the minor leaguers were damaged in the form of lower compensation by Defendants' antitrust violations;

(e) whether Defendants have colluded, conspired, agreed and/or acted or refused to act on grounds generally applicable to the Class, thereby making final injunctive or declaratory relief appropriate with respect to the Class as a whole;

(f) whether the nearly hundred-year-old, so-called court-created antitrust "baseball exemption" is unconstitutional as a violation of minor leaguers' constitutional right to equal protection of the laws as applied to the reserve clause applied against minor

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

league players and, if it is, whether it should be overturned based on changed circumstances, including, but not limited to, no collective bargaining for minor leaguers;

(g) whether the Sherman Act 15 U.S.C. §§1 and 2 and the Clayton Act 15 U.S.C. §§15 and 26, in purportedly not being applicable to MLB's monopolistic and restraint of trade actions against minor leaguers, are unconstitutional as violative of the minor leaguers' right to equal protection of the laws; and

(h) whether the so-called Curt Flood Act 15 U.S.C. §26b is unconstitutional, as violating minor leaguers' constitutional right to equal protection of the laws, by purporting to exempt Defendants from liability for violating minor leaguers' rights under the federal anti-trust laws.

94.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Class is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens on the courts and the parties and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action would achieve substantial economies of time, effort, and expense in adjudicating these common claims and issues, and would assure uniformity of decision as to persons similarly situated, without sacrificing procedural fairness.

95.    The interest of members of the Class in individually controlling the prosecution of separate actions is impractical. The Class has a high degree of cohesion and prosecution of the action as a representative class action would be unobjectionable. The amounts at stake for Class members, while substantial in the aggregate, are not large enough individually to make it practical to Class members to prosecute their claims individually. As individuals, the class members would lack the resources to vigorously litigate against the ample and powerful resources of the Defendants' cartel. Also, many of the Class members are current minor league

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

players and would not bring an individual action out of fear of retaliation. There would not be any difficulty in the management of this action as a class action. The members of the Class are employed by and known to Defendants. The Class members are readily identifiable and can be located through Defendants' own records.

96.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 because Plaintiffs' claims arise under laws of the U.S. that regulate commerce and protect commerce against restraints and monopolies: Section 4 of the Clayton Act (15 U.S.C. § 15), Section 4 of the Sherman Act (15 U.S.C. § 4), Section 16 of the Clayton Act (15U.S.C. § 26), and Section 1 of the Sherman Act (15 U.S.C. § 1).

97.     This Court has *in personam* jurisdiction over MLB and each of the 30 defendants because it/they transact(s) substantial business in this District; engaged in antitrust violations in substantial part in this District; and it and they have entered into and engaged in a conspiracy and exercised their monopsony power that is intended to have, and has had, an anticompetitive effect on commerce in this District.

98.     This Court additionally has *in personam* jurisdiction over MLB because it receives income and services from the Class in this District.

99.     Venue is proper in this Court pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. §§ 1391(b), (c) and (d), because MLB is subject to this Court's personal jurisdiction with respect to this action, a substantial part of the events giving rise to Plaintiff's and the Class's claims occurred in this District, and Plaintiffs and the Class have suffered and will continue to suffer harm in this District as a result of the MLB conspiracy averred herein.

## V.     FACTUAL ALLEGATIONS

### II.  The Business of MLB

100.     MLB is big business. Its games are broadcast throughout the United States. During the 2019 season, over 68.5 million fans paid to attend MLB games. MLB revenues

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

exceeded $12.4 Billion, and the average value of an MLB team exceeded $2 Billion. MLB national television revenues were $1.84 Billion and local television revenues were $2.1 Billion.

101.     The baseball players employed by the Defendants account for much of this rise in revenue, as they comprise the chief product offered by MLB and its teams. Without baseball players, MLB and its teams would not exist. Yet MLB and its Franchises pay most players – the minor leaguers – depressed compensation through the use of forced UPCs and the reserve clause which restricts competition by preventing minor leaguers from fairly negotiating to receive higher compensation. Defendants have recently sought to increase their monopsony power and further depress minor leaguers' compensation by eliminating a number of minor league teams.

### III. Minor Leaguers' Uniform, Adhesive Contracts

102.     Since the 1920s, all MLB teams have used an extensive "farm system" to develop players. MLB teams employ a small number of major leaguers that perform in MLB stadiums at the game's highest level. MLB Rules allow Franchises to only maintain 25 major leaguers on an "active roster" and a few additional players reserved on the "40-man" roster. A few more players are inevitably on the major league disabled list, so each Franchise employs a little over 40 major leaguers.

103.     But each Franchise simultaneously stockpiles around 150 to 250 minor leaguers that perform at the minor league levels of baseball. It is estimated that, at any given time, the Defendants collectively employ around 6,000 minor leaguers total. The Defendants employ this high number of minor leaguers in their farm systems, hoping some will eventually develop into major leaguers.

104.     Minor leaguers have no union. Without a union to counteract Defendants' power, Defendants have exploited minor leaguers by, among other things, continuing to promulgate and impose oppressive rules on minor leaguers' entry into the industry, by restriction of their movement to other teams, by conspiring and agreeing to fix the compensation they pay the Class at anti-competitive, depressed amounts, and by conspiring to

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

reduce the number of minor league teams and consequently, the number of ballplayers the teams will employ.

105.        The MLB teams acquire minor leaguers in one of two ways: through an amateur draft or through free agency.

106.        The amateur draft, known as MLB's Rule 4 draft,[30] occurs in June of each year. In 1965, Commissioner Ford Frick oversaw the development and implementation of what is now the Rule 4 draft. By forcing amateur players to participate in the draft, MLB and its Commissioner limited those players seeking to enter MLB's developmental system to only negotiating with a single team. Thus, signing bonuses declined.[31]

107.        Upon information and belief, Bud Selig sought to, and Mr. Manfred has continued to further curb signing bonuses for draftees. Acting in his capacity as chief labor agent,[32] he directed the development and implementation of an informal "slotting" system with recommended signing bonuses for each high-level pick. To enforce the mechanism, Mr. Selig required, and Mr. Manfred has continued to require a Franchise's scouting director to call the Commissioner's office prior to exceeding the recommended slot level. This requirement of approval is an outgrowth of MLB's rules, which require all minor league contracts to be filed with and approved by the Commissioner.[33]

108.        A new, stricter system was instituted in 2012. The current system places limits on the amounts Franchises can spend on signing bonuses.

109.        MLB's current Rule 4 draft, as developed and enforced by the Commissioner, requires all amateur players from Puerto Rico, the United States, and Canada to participate in

---

[30] MLR 4.

[31] MLB teams offer large signing bonuses to the most talented amateur players as an incentive to forego college. Only the very top amateurs, however, receive large signing bonuses. The majority of amateurs signed through the draft receive quite small signing bonuses, usually around $2500.

[32] MLC Art. II § 2.

[33] *See* MLR 3(e) (requiring all contracts to be approved by the Commissioner); MLR Attachment 3, UPC ¶ XXVI (requiring approval by the Commissioner for the contract to have effect).

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

the draft in order to sign with an MLB team.[34] Beginning with the worst MLB team from the previous season, teams select amateur players over the course of forty rounds.

110.    Players selected in the Rule 4 draft are between the ages of 18 and 22 (with the exception of a few players who are 23). Once selected by a Franchise, a player cannot bargain with any other Franchise, as MLB's rules grant the drafting Franchise exclusive rights to the player.[35]

111.    In addition to the draft, teams acquire previously amateur Latin American players through free agency. MLB rules allow the Franchises to sign the players as early as age sixteen, so most Latinos are either sixteen or seventeen when signing with a Franchise.[36]

112.    Most Latino minor leaguers come from poor families and have only the equivalent of an eighth-grade education. Before signing, many are only represented by similarly-educated "buscones"—usually former players who maintain training facilities for young amateur players. Some of the Franchises' scouts have been reprimanded in recent years for participating in bribes and kickback schemes with the buscones, and the FBI has even investigated the exploitative practices.[37] These Latino signees comprise over forty percent of minor leaguers.

113.    Like the slotting system, Mr. Selig also personally oversaw, and Mr. Manfred continues to oversee the development of bonus pools for Latino players in an effort to curtail Latino signing bonuses, which artificially and anti-competitively limits the amount each Franchise can spend on signing bonuses for Latino players.

114.    Teams also sign additional players from the United States, Canada, and Puerto Rico who were not drafted in the Rule 4 draft.[38] MLB rules place limits on when such free

[34] MLR 4(a).

[35] MLR 4(e).

[36] *See* MLR 3(a).

[37] *See* Jorge L. Ortiz, *Exploitation, steroids hitting home in Dominican Republic*, USA Today (Mar. 26, 2009), http://usatoday30.usatoday.com/sports/baseball/2009-03-26-dominican-republic-cover_N.htm.

[38] MLR 4(i).

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

agent acquisitions can occur. Since they were not selected in the draft, they are viewed as less skilled amateur players and, even as free agents, have no bargaining power.

115.     Defendants require all teams to use the same uniform player contract ("UPC") when signing amateur players. MLR 3(b)(2) states:

> To preserve morale among Minor League players and to produce the similarity of conditions necessary for keen competition, all contracts…shall be in the form of the Minor League Uniform Player Contract that is appended to these Rules as Attachment 3. All Minor League Uniform Player Contracts between either a Major or a Minor League Club and a player who has not previously signed a contract with a Major or Minor League Club shall be for a term of seven Minor League playing seasons…. The minimum salary in each season covered by a Minor League Uniform Player Contract shall be the minimum amount established from time to time by the Major League Clubs….

116.     Moreover, "[a]ll contracts shall be in duplicate," and "[a]ll…must be filed with the Commissioner…for approval."[39] No contract can vary any term without the approval of the Commissioner.[40] A minor leaguer cannot work for an MLB team without signing the UPC because a "player's refusal to sign a formal contract shall disqualify the player from playing with the contracting Club or entering the service of any Major or Minor League Club."[41]

117.     Thus, the UPC grants the MLB team the exclusive rights to the minor leaguer for seven championship seasons (about seven years).[42] During that time period, the MLB team may assign the minor leaguer's rights to any other team, and the MLB team may terminate the agreement at any time for almost any reason.[43]

118.     But the minor leaguer cannot leave voluntarily to play for another baseball team—even outside of MLB, and even outside of the United States.[44] A player doing so "shall

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

---

[39] MLR 3(b)(3); *see also* MLR 3(b)(4) (saying that a player cannot play until the UPC is signed).

[40] MLR 3(b)(3).

[41] MLR 3(d).

[42] MLR 3(b)(2); MLR Attachment 3, UPC ¶ VI.A.

[43] MLR 9; MLR Attachment 3, UPC ¶ XVIII.

[44] MLR 18; MLR Attachment 3, UPC ¶ XVI.

be subject to the discipline of the Commissioner."[45] Retirement from baseball during the seven-year term requires the Commissioner's approval.[46]

119.     The UPC restricts a player in the minor leagues of a single organization. A minor leaguer selected in the amateur draft can only sign with the MLB team that drafted him. For the next seven years, the MLB team controls the minor leaguer's rights. By the expiration of the contract, much of the value of the minor leaguer as a young prospect has expired because the player has aged.

120.     Since the signing of a 1962 Player Development Plan, MLB requires MLB Franchises to maintain a certain number of minor league teams. Currently, all MLB teams have minor league teams at all the levels of the minor leagues, with most having either seven or eight minor league teams, until recently, when Defendants conspired and agreed to reduce the number of minor league teams and consequently, to reduce the number of minor leaguers, thereby increasing Defendants' monopsony power to fix and depress, at anti-competitively low levels, the compensation paid to the Class Members.

121.     Often the MLB Franchises do not operate the minor league stadium but instead sign agreements with owners of minor league teams. These agreements are known as Player Development Contracts ("PDC"), and the teams are affiliates of the MLB Franchises.

122.     MLB rules make clear that MLB and its Franchises remain the employers of minor leaguers at all times when using PDCs. MLR 56(g) states:

> The players so provided shall be under contract exclusively to the Major League Club and reserved only to the Major League Club. The Minor League Club shall respect, be bound by, abide by and not interfere with all contracts between the Major League Club and the players that it has provided to the Minor League Club.

123.     Moreover, MLB requires the MLB Franchise to pay the salaries of the minor league players at all times and allows the MLB Franchise the ability to control assignments.[47]

124.     Since minor leaguers do not belong to a union, nothing has prevented the

[45] MLR 18.

[46] MLR 14.
[47] MLR 56(g).

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

Defendants from artificially and illegally depressing minor league wages. Because of Defendants' monopsony over the entryway into the highest levels of baseball and given the young minor leaguer's strong desire to enter the industry, Defendants have exploited minor leaguers by paying them depressed compensation, below what they would receive in a competitive market.

125.    Plaintiffs are informed and believe that Defendants, through the Commissioner, issue minor league salary "guidelines" for players signed to an initial UPC, and teams deviate very little from these guidelines. MLR 3(c) requires that all first-year minor leaguers earn "the amount established by" MLB.[48]

126.    Salaries beyond the first year are very similar across all Franchises. It is believed that Defendants conspire to discuss and agree to fix the compensation to be paid to minor leaguers (and other working conditions concerning minor leaguers). These price fixing agreements occur when MLB hosts its quarterly owner meetings that all Defendants attend.

127.    While salary guidelines are not publicly available, the Plaintiffs are informed and believe, based on the salaries paid by the Defendants across the minor leagues, that, during the Class Period, the Defendants fixed the salaries paid to minor leaguers as low as  $1,100 per month for Rookie and Short-Season A; $1,250 per month for Class-A; $1,500 per month for Class-AA; and $2,150 for Class-AAA, all for a 5-month period.

128.    Beyond the first year, the UPC required by MLB, and enforced by the Commissioner, purports to allow salary negotiation by the minor leaguer, as the UPC states that salaries will be set out in an addendum to the UPC and subject to negotiation.[49] But the same UPC provision states that if the Franchise and minor leaguer do not agree on salary terms, the Franchise may unilaterally set the salary and the minor leaguer must agree to it.[50]

129.    In truth, then, the UPC—and Defendants—do not allow for minor league salary

---

[48] As the 2013 Miami Marlins Minor League Player Guide states, "all first-year players receive $1,100 per month regardless of playing level per the terms of the [UPC]."

[49] MLR Attachment 3, UPC ¶ VII.A.

[50] MLR Attachment 3, UPC ¶ VII.A.

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

negotiations. It is believed that the Franchises agree to follow MLB's salary guidelines, and the minor leaguers must accept them. For example, the 2013 Miami Marlins Minor League Player Guide states, "This salary structure will be strictly adhered to; therefore, once a salary figure has been established and sent to you, there will be NO negotiations."

130.     MLB also centrally controls when and how minor leaguers are paid. During the championship season, the Franchises must pay minor leaguers "in two (2) semi-monthly installments on the 15th day and last day of the month."[51]

131.     The UPC, required by MLB, further states that salaries are only to be paid during the championship season, which lasts about five months out of the year. [52] Plaintiffs believe that, during the Class Period, most minor leaguers earned less than $12,000 per calendar year. Despite only being compensated during the approximately five-month championship season, MLB's UPC "obligates minor leaguers to perform professional services on a calendar year basis, regardless of the fact that salary payments are to be made only during the actual championship playing season." [53] Consistent with that obligation, the UPC states that "Player therefore understands and agrees that Player's duties and obligations under this Minor League Uniform Player Contract continue in full force throughout the calendar year."

132.     The Defendants' application of the UPC, requires the minor leaguer to participate in spring training.[54] Again, the UPC does not allow for salaries during this period since spring training falls outside the championship season, so minor leaguers work without earning a paycheck. The spring training season usually lasts around one month, during the month of March, but it sometimes lasts longer.

133.     Around 30–50 minor leaguers per MLB Franchise do not earn a roster spot on a

---

[51] MLR Attachment 3, UPC ¶ VII.B.

[52] MLR Attachment 3, UPC ¶ VII.B. ("Obligation to make such payments to Player shall start with the beginning of Club's championship playing season…[and] end with the termination of Club's championship playing season….").

[53] MLR Attachment 3, UPC ¶ VI.B.

[54] See MLR Attachment 3, UPC ¶ VI.B. (saying that the UPC applies to the "Club's training season").

minor league team at the end of spring; they instead remain at the Franchise's spring training site in "extended spring training." Since they are not participating in a championship season, MLB's UPC again does not require salaries to be paid.[55] Upon information and belief, many of these players will not earn paychecks until the end of June, when the Rookie and Short-Season A leagues begin. Thus, many minor leaguers are not paid for work performed during March, April, May, and most of June.

134.     At the end of the championship season, around 30–45 minor leaguers per MLB Franchise are also selected to participate in an instructional league to further hone their skills. Again, MLB's UPC—as approved and enforced by Mr. Selig—requires minor leaguers to perform this work without pay since it is outside the championship season, so the minor leaguers receive no paychecks during the instructional league.[56] The instructional leagues usually last around one month.

135.     MLB's UPC also requires minor leaguers to maintain "first-class" conditioning throughout the calendar year[57] because the player's "physical condition is important to…the success of the Club."[58] Consequently, a "Club may require Player to maintain Player's playing condition and weight during the off-season and to report for practice and condition at such times and places as Club may determine."[59] If the player fails to meet these requirements, the "Club may impose a reasonable fine upon Player…."[60]

136.
     The Defendants therefore require players to perform extensive training and conditioning during the winter off-season. It is believed that all Franchises direct the winter work by issuing training packets to all the players. Many, and perhaps all, Franchises monitor workouts

---

[55] MLR Attachment 3, UPC ¶ VII.B.

[56] MLR Attachment 3, UPC ¶ VII.B.

[57] MLR Attachment 3, UPC ¶ XII.

[58] MLR Attachment 3, UPC ¶ VI.D.

[59] MLR Attachment 3, UPC ¶ VI.D.

[60] MLR Attachment 3, UPC ¶ VI.D.

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

and punish players for not performing off-season workouts. Minor leaguers receive no wages during this training period because it is outside the championship season.[61]

### III.    The Antitrust Exemption for the "Business of Baseball"

137.     The Defendants seek to avoid their "reserve clause" and UPC antitrust violations under the judicially created exemption from the antitrust laws under the Federal Baseball,[62] Toolson,[63] and Flood [64] trilogy of Supreme Court cases. That judicially created exemption has long since been criticized, even by the Supreme Court itself.  [Justice Douglas in Flood, supra 407 U.S. at 286, summed it up. "This Court's decision in Federal Baseball Club…is a derelict in the stream of the law that we, its creator, should remove."] and again in the recent case, *National Collegiate Athletic Association v. Alston* 141 S.Ct. 2141, 2159, 2167-2168 (2021) where the Supreme Court referenced the antitrust exemption for minor leaguers and questioned it as something "akin" to an exemption. The exemption no longer has, if it ever had, any current basis in economic reality, especially for the market in minor league professional baseball players' compensation where minor leaguers have no union, no collective bargaining, no free agency, or other means of fairly negotiating for their services.

138.     The judicially created "baseball exemption" from the antitrust laws no longer has any underpinning. The initial rationale, that professional baseball's cartel was not engaged in interstate commerce and was therefore not subject to federal antitrust regulation, has since been rejected by the Supreme Court, in its decision in Flood v. Kuhn, 407 U.S. 258 (1972). The stare decisis rationale and the rationale that Congress, not the courts should redress the baseball exemption also have no basis. Congress did address the issue in 1890, when it enacted the Sherman Act to outlaw restraints on trade and the exercise of monopsony power that harm

---

[61] *See* MLR Attachment 3, UPC ¶ VII.B.

[62] Fed. Baseball Club of Baltimore v. Nat'l League of Prof'l Base Ball Clubs, 259 U.S. 200 (1922).

[63] Toolson v. New York Yankees, Inc., 346 U.S. 356 (1953).

[64] Flood v. Kuhn, 407 U.S. 258 (1972)

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

competition. There is no need for Congressional legislation, it already exists.

139.      The "baseball exemption" allows the Defendants to conspire and collude, through the "reserve clause" and uniform player contracts, to prevent minor league baseball players from shopping their services to competing teams. It results in the per se antitrust violation of price fixing, at artificially low levels, the compensation minor league players can receive, by preventing minor league players from offering their services to competing teams who, in a competitive market, would offer them more for their services. The Defendants have a monopsony in the provision of professional baseball games and the players that produce those games. Defendants reap huge financial rewards as a result of their monopsony power and restraints on competition. The minor league players who have no union, no collective bargaining, and no free agency, are at a competitive disadvantage and need the protection of the antitrust laws to stop the financially superior Defendants from continuing to give the minor league players the short end of the bat.

140.      Plaintiffs seek relief under the federal antitrust laws in connection with a threatened loss resulting from the unlawful exercise of market power by MLB in the market for minor league men's professional baseball contracts in the United States, Mexico, Canada and the Caribbean. MLB is excluding competition and restraining trade in that market through the application of unreasonable restrictions on minor league player compensation by preventing Defendants from negotiating, contracting, paying and competing for minor league players.

141.      MLB is made up of separately owned competitive member teams and has monopsony market power in the provision of wage and compensation payments to minor league players in North America and Latin America. Use by Defendants of the reserve clause, the UPC, and draft, which grants each Club absolute veto power and control over their minor league players' ability to negotiate and contract for higher compensation with other teams, are per se violations or, in the alternative, unreasonable, unlawful, and anticompetitive restraints under Section 1 of the Sherman Act.

142.      Through MLB and the exclusionary and anticompetitive provisions in the MLB

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

Constitution, Defendants have conspired to violate the antitrust laws, and have willfully acquired and maintained monopsony power in violation of Section 2 of the Sherman Act within the market for minor league professional baseball players by preventing such minor league players from freely negotiating with other teams for their services and the compensation they should receive.

143.     MLB is comprised of thirty separately owned and operated major league men's baseball clubs in the United States and Canada. The MLB, like other sports leagues, have structured their governance to permit major decisions regarding on-field sporting competition and off-field business competition to be made by the club owners themselves. In so doing, the owners act in their own economic self-interest, including entering into a series of agreements that eliminate, restrict, and prevent off-field competition. These anticompetitive agreements go far beyond any cooperation reasonably necessary to provide minor league men's professional baseball contests to consumers.

144.     This action challenges — and seeks to remedy — Defendants' per se or rule of reason or quick look violation of the federal antitrust laws and the use of the illegal cartel to institute and maintain the reserve clause and UPC as a means to stifle competition and suppress the compensation that minor leaguers receive, which would be significantly higher absent Defendants antitrust violations, which eliminate competition in the payment of minor leaguers. Defendants have recently conspired and agreed, effective in November 2021, to eliminate 40 of the 160 minor league teams and thereby increase their monopsony power and further reduce competition in the payment of minor league players. This conspiracy is directed at reducing the compensation paid to minor leaguers by eliminating competition for their services.

145.     These violations of laws and restraints are not necessary to maintain and obtain the services of minor league players and are per se wage fixing violations or, in the alternative, are quick look or rule of reason violations of the antitrust laws. 15 U.S.C. §§1 and 2

## VII.     The Agreements Have Restrained Competition and Have Had Anticompetitive Effects and Led to Consumer Harm

146.     The above-described agreements have restrained horizontal competition

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

between and among the Defendants and the MLB, including in the procurement of, and payment of compensation to, minor league players where the 30 defendant teams could and would compete with each other. In particular, in the absence of the reserve clause restrictions and other above-described competitive restraints, Defendants would compete with each other in the acquisition of, and compensation to minor league players to a much greater extent than they do now, which would result in higher compensation and wages paid to minor league players.

147.    The above-described agreements have adversely affected and substantially lessened competition in the relevant market for acquisition of and payment to minor league baseball players.

148.    Competition by individual Defendants independently acting to acquire and retain minor league players would benefit the minor league players by providing them better and competitive compensation.

149.    There are no legitimate, pro-competitive justifications for these anti competitive restrictions on compensation and the inability of minor league players to offer their services to teams that will compete for their services and pay them higher compensation.

150.    Defendants' conspiracy and agreements to use the UPC and reserve clause have resulted in anticompetitive and unlawful purposes. The adverse effects of such misuse are continuing, and the UPC restrictions on compensation and player movement should be enjoined and declared unenforceable.

**IV.    Plaintiff and the Class Have Suffered Antitrust Injury – Damages for Violation of Section 1 of the Sherman Act**

151.    Plaintiff and the Class incorporate and reallege, as though fully set forth herein, Paragraphs 1 through 152 above.

152.    Beginning at a time presently unknown to Plaintiffs, and continuing through the present, Defendants and their co-conspirators entered into a continuing agreement, combination or conspiracy in restraint of trade with the purpose, intent, and effect of restraining horizontal competition among the Defendants and the MLB, with the purpose, intent, and effect of

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

restraining trade and commerce in the employment of and compensation paid to minor league professional baseball players, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

153.     The contract, combination or conspiracy has resulted in an agreement, understanding, or concerted action between and among Defendants and their co-conspirators that minor league players are restrained and prevented from playing for and negotiating for compensation from other minor league professional baseball teams.

154.     The contract, combination, or conspiracy has restrained competition between and among Defendants in violation of Section 1 of the Sherman Act. It has led to anticompetitive effects in the relevant markets resulting in below competitive compensation to minor leaguers, as alleged above and has caused injury to competition in those relevant markets and elsewhere.

155.     Defendants' contract, combination, agreement, understanding or concerted action with the co-conspirators occurred in or affected interstate commerce. Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between and among Defendants and other unnamed co-conspirators. These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

156.     Defendants' anticompetitive conduct has directly and proximately caused antitrust injury, in the form of lower compensation (or no compensation) to minor league players than they would have received absent Defendants' antitrust violations, as set forth above.

157.     Plaintiff and the Class have suffered cognizable antitrust injury under the Sherman Act. There has been injury to competition in the relevant product market, which is the market for professional minor league baseball players. Defendants should, but do not compete for minor league players.

158.     Defendants' actions have placed direct and indirect restraints on the acquisition, movement, and payment of minor league players, all of which are per se antitrust wage fixing violations which directly and indirectly affect interstate commerce. Major League Baseball is

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

an unreasonable and unlawful monopsony created, intended and maintained by Defendants for the purpose of permitting an intentionally select and limited group, the Defendants, to reap enormous profits. MLB has achieved these restraints on trade and its monopsony status by engaging in an unlawful combination and conspiracy, the substantial terms of which have been to eliminate all competition in the relevant market for minor league players, to exclude and prevent them from obtaining fair, competitive compensation for their services, to establish monopsony control of the relevant market for minor league players and to unreasonably restrain trade by conspiring to fix, at below market value, the compensation paid to minor league players.

159.    Defendant's unlawful activities have resulted in (a) an unlawful restraint of trade in minor league players' compensation; (b) the elimination of competition for minor league players' services by fixing the compensation minor league players receive and by eliminating competition through the exercise of MLB's exclusive, dominant and monopsony position in the minor league professional baseball market.

160.    As a result of Defendants' anticompetitive agreements, Plaintiff and the Class are injured because minor league players are prevented from obtaining fair competitive compensation for their baseball services and are denied the freedom of movement otherwise available to players in virtually every other professional sport in the United States.

161.    Plaintiff's injuries are also injuries to the public and to competition. The major league teams lose the ability to field more competitive teams, the fans lose out on viewing a better baseball product, and the economy loses increased tax revenue, jobs, and business growth by increased minor league player purchasing power.

162.    While the full amount of Plaintiff's and the Class's damages are not presently known, they will be calculated after discovery and will be awarded based on proof at trial. The combination and conspiracy alleged herein has injured Plaintiff and the Class and continues to threaten the Class with loss or damage in lower compensation than they would receive in a competitive market.

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

**Count 2: Damages for Violation of the Sherman Act 15 U.S.C. § 2**

163.     Plaintiff and the Class incorporate and reallege, as though fully set forth herein, Paragraphs 1 through 162 above.

164.     Defendants and their co-conspirators created, operated, aided, or abetted a trust, combine, or monopsony for the purpose of creating and carrying out restrictions on trade or commerce with the purpose, intent, and effect of restraining horizontal competition among the Defendants and the MLB for the acquisition of and compensation paid to minor league professional baseball players.

165.     The trust, combination, or monopsony has resulted in an agreement, understanding, or concerted action between and among Defendants and their co-conspirators that suppresses the compensation paid to minor league players.

166.     By virtue of the exclusionary and anticompetitive UPC (which all minor league players are required to sign) and the reserve clause of the MLB Constitution, Defendants, through MLB, have willfully acquired and maintained monopsony power in the relevant market by blocking the movement of and ability to negotiate and receive competitive compensation for minor league players, thereby preventing competition in the relevant market.

167.     The Defendants, which should be actual competitors in the market for minor league men's professional baseball players, have conspired with and through MLB, through the monopolistic use of the UPC and "reserve clause" to maintain a monopsony power over these minor league players by refusing to allow them to negotiate with or move to or offer their services to other minor league teams, thereby restricting trade and commerce, limiting competition within the market area, and controlling at depressed below competitive compensation the wages and compensation paid to minor league players.

168.     Through the anticompetitive conduct described herein, Defendants and their co-conspirators have willfully acquired and maintained, and unless restrained by the Court, will continue to willfully maintain, that monopsony power over the market for minor league players

by anticompetitive and unreasonably exclusionary conduct. These activities have gone beyond those which could be considered as "legitimate business activities," and are an abuse of market position. Defendants and their co-conspirators have acted with an intent to illegally acquire and maintain that monopsony power in the relevant market, and their illegal conduct has enabled them to do so, in violation of the Sherman Act, 15 U.S.C. §§1 and 2.

169.    Plaintiff and the Class have suffered an ascertainable loss of money or property as the result of the actions of Defendants and their co-conspirators, including but not limited to the loss of competitive, higher compensation they would have received in a competitive market absent Defendants' anticompetitive actions.

170.    The conduct of Defendants and their co-conspirators is a substantial factor in Plaintiff's and the Class's loss. The loss was a direct and proximate result of the willful conspiracy of Defendants and their co-conspirators to monopolize, restrain trade and lessen competition.

171.    Because Defendants and their co-conspirators created, operated, aided, or abetted a trust with the purpose of lessening competition in the business of minor league baseball player compensation. Plaintiff and the Class seek damages and injunctive relief pursuant to 15 U.S.C. §§ 1, 2, 15. Pursuant to the Clayton Act, 15 U.S.C. § 15, Plaintiff and the Class are authorized to recover three times the damages they sustained plus interest.

172.    As a direct and legal result of the acts of Defendants and their co-conspirators, Plaintiff was forced to file this action, resulting in ongoing attorneys' fees, costs, and other expenses for which he seeks recovery according to proof.

**Count 3: Injunctive Relief - Violation of Sections 1 and 2 of The Sherman Act**

173.    Plaintiff and the Class incorporate and reallege, as though fully set forth herein, Paragraphs 1 through 172 above.

174.    Defendants possess monopsony power in the market for minor league men's professional baseball players.

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

175.     By virtue of exclusionary and anticompetitive provisions in the UPC and MLB Constitution, including the "reserve clause", Defendants have willfully acquired and maintained monopsony power in the relevant market by blocking the movement of minor league players and their ability to negotiate and receive competitive compensation for their services, thereby preventing competition in that market.

176.     Defendants (which should be actual competitors in the market for minor league men's professional baseball players) have conspired with and through MLB to maintain a monopsony power in the market for minor league players by unreasonably refusing to allow them to move from the clubs that drafted them or to negotiate for compensation.

177.     Through the anticompetitive conduct described herein, Defendants and their co-conspirators have willfully acquired and maintained, and unless restrained by the Court, will continue to willfully maintain, that monopsony power over the market for minor league baseball players by anticompetitive and unreasonably exclusionary conduct. These activities have gone beyond those which could be considered as "legitimate business activities," and are an abuse of market position. Defendants and their co-conspirators have acted with an intent to illegally acquire and maintain that monopsony power in the relevant market, and their illegal conduct has enabled them to do so, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

178.     Defendants' anticompetitive conduct has directly and proximately caused antitrust injury to Plaintiff and the Class, as set forth above. Plaintiff and the Class will continue to suffer antitrust injury and threatened loss or damage unless Defendants are enjoined from continuing to engage in the above-described violations of the antitrust laws.

**Count 4: Declaratory Relief - Curt Flood Act**

179.     Plaintiff realleges Paragraphs 1 through 178 above as though fully set forth herein.

180.     In 1998, the MLB defendants lobbied and induced Congress to pass the Curt Flood Act (15 U.S.C. §26b(b)(1), (2)) which unlawfully discriminates against and denies equal

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

protection of the antitrust laws (Sections 1 and 2 of the Sherman Act 15 U.S.C. §§1 and 2 and Section 4 of the Clayton Act 15 U.S.C. §15) to minor league baseball players, by specifically denying them the rights and protection to be free from antitrust violations, including conspiracies by Defendants to depress, at below market rates, the compensation paid to persons for their work all other similarly situated persons enjoy. There is no rational basis for the federal government's enactment of this discriminatory law which, on its face and as applied, violates minor league baseball players' right to equal protection of the law as guaranteed by the Fourteenth Amendment of the United states Constitution.

181.     Plaintiff and the Class he represents have been and will continue to be harassed by this facially discriminatory law and its discriminatory application in that they have been and will continue in the future to be deprived of property in the form of depressed, non-competitive, fair wages and compensation for their services as minor league baseball players unless the law is declared unconstitutional, and its implementation is enjoined.

**Count 5: Declaratory Relief - Sherman Act**

182.     Plaintiff and the Class reallege Paragraphs 1 through 181 above as though fully set forth herein.

183.     In 1922, the United States Supreme Court, in *Federal Baseball Club of Baltimore v. National League of Professional Baseball Clubs* 259 US 200 (1922), judicially created a so-called "business of baseball exemption" to the antitrust laws (Sections 1 and 2 of the Sherman Act 15 U.S.C. §§1 and 2) that supposedly exempted major league baseball teams, Defendants herein, from complying with the antitrust laws. In so doing, the Sherman Act was and has been treated and enforced as if its antitrust provisions and protections, including 15 U.S.C. §§1 and 2, apply to all other persons and entities (with some reasonable exemptions), but do not apply to minor league baseball players.

184.     That business of baseball purported exemption, read into the Sherman Act §§1 and 2 and as applied, is unconstitutional since it discriminates, without a rational basis, against

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

minor league players and deprives them of their constitutional right to equal protection of the law by specifically denying them the rights and protection to be free from antitrust violations, including conspiracies by Defendants to depress, at below market rates, the compensation paid to minor league baseball players. There is no rational basis for the federal government's purported enactment and/or application of this discriminatory law (exemption) which, on its face and as applied, violates minor league baseball players' right to equal protection of the law as guaranteed by the Fifth Amendment of the United States Constitution, and/or 42 U.S.C. §1983.

185.    Plaintiff and the Class he represents have been and will continue to be harmed by this facially discriminatory law and its discriminatory application in that they have been and will continue in the future to be deprived of property in the form of depressed, non-competitive, fair wages and compensation for their services as minor league baseball players unless the law is declared unconstitutional, and its implementation is enjoined. The law and the exemption should be declared unconstitutional and voided and Defendants should be enjoined from continuing to violate the law and discriminate against minor league players in the compensation they are paid and in the teams for which they can play.

## FEDERAL WAGE AND HOUR VIOLATIONS
### Count 6: FLSA Minimum Wage and Overtime Violations

(Plaintiff and the Minor League Collective Against All Defendants)

186.    Plaintiff Daniel Concepcion and the Class re-allege and incorporate by reference all allegations in all preceding paragraphs.

187.    *Common characteristics of the Proposed Classes*. All of the Proposed Classes share the following characteristics, making them all optimal for class resolution:

188.    Each of the Proposed Classes is so numerous that joinder of all members is impracticable. While the exact number of Class members in each Class is unknown to Plaintiff at this time, Plaintiff is informed and believes that several hundred geographically dispersed

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

Class members worked, will work, and continue to work as minor leaguers in Puerto Rico and other applicable states, either during spring training, at promotional events, during other training and work periods, or during championship seasons occurring within the states.

189.    Plaintiff's claims are typical of the claims of the other members of each of the Proposed Classes. Plaintiff and the members of the Proposed Classes were subject to the same or similar compensation practices arising out of Defendants' common course of conduct in violation of the FLSA and applicable state laws as alleged herein. Plaintiff and the Proposed Classes have sustained similar types of damages as a result of these common practices.

190.    Plaintiff will fairly and adequately protect the interests of the members of all members of the Proposed Classes because they possess the same interests and suffered the same general injuries as class members. Plaintiff has retained counsel competent and experienced in class action litigation, including employment litigation.

191.    Common questions of law and fact exist as to all members of the Proposed Classes and predominate over any questions affecting solely individual members of the Class. Among the many questions of law and fact common to the Proposed Classes are:

(a) whether Defendants conspired and agreed to and did set wages at a rate below the minimum wages required under the FLSA and/or Puerto Rico's labor laws;

(b) whether Defendants paid and continue to pay no wages at all during certain pay periods, contrary to the requirements of federal and Puerto Rico's applicable labor laws;

(c) whether any exemptions apply to the industry or to minor leaguers;

(d) whether Defendants require all minor leaguers to sign the same UPC, which controls minor leaguers' pay and pay periods and enables the unlawful labor practices;

(e) whether Defendants willfully, or with reckless disregard, carried out their unlawful practices;

(f) the compensability of certain work periods and the appropriate method of measuring

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

damages for the injuries sustained by Plaintiffs and other members of the Proposed Classes as a result of Defendants' unlawful labor activities; and

(g) Whether Defendants have colluded, conspired, agreed and/or acted or refused to act on grounds generally applicable to the Plaintiff Class, thereby making final injunctive or declaratory relief appropriate with respect to the Plaintiff Class as a whole.

192.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members in each of the Proposed Classes is impracticable. The prosecution of separate actions by individual members of the Proposed Classes would impose heavy burdens on the courts and the parties, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.

193.     The interest of members of each of the Proposed Classes in individually controlling the prosecution of separate actions is highly limited and impractical. Each of the Proposed Classes has a high degree of cohesion and prosecution of the action through representatives would be unobjectionable. The amounts at stake for Class members, while substantial in the aggregate, are often not great individually. As individuals, the class members would lack the resources to vigorously litigate against the ample and powerful resources of the Defendants' cartel. Importantly, many of the Class members are current minor league players and would not bring an individual action out of fear of retaliation. Lastly, Plaintiff does not anticipate any difficulty in the management of this action as a class action.

## IV.    FLSA COLLECTIVE ACTION ALLEGATIONS

194.     Plaintiff Daniel Concepcion and the Class bring Counts 6 and 7, the FLSA

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

claims, and Counts 8 and 9 Puerto Rico minimum wage and overtime claims on behalf of themselves and all persons similarly situated from 2012 through resolution of this action (the "Minor League Collective").

195.    The Defendants are liable under the FLSA for, *inter alia*, failing to properly compensate Plaintiff and the members of the Minor League Collective. The Minor League Collective consists of thousands of similarly situated individuals who have been, will be, and/or continue to be underpaid during certain work periods and not paid at all during other work periods. This Collective would benefit from the issuance of a court-supervised notice of the lawsuit and the opportunity to join the lawsuit.

196.    The members of the Minor League Collective are known to Defendants, are readily identifiable, and can be located through Defendants' records. Notice should be sent to the members of the Collective pursuant to 29 U.S.C. § 216(b).

## V.    JURISDICTION, VENUE, AND COMMERCE

197.    This Court has subject matter jurisdiction with respect to Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1337, and jurisdiction over Plaintiff's Puerto Rico labor law claims pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction).

198.    Plaintiff's and the Class's Puerto Rico labor law claims are so closely related to Plaintiff's and the Class's claims under the FLSA that they form part of the same case or controversy under Article III of the United States Constitution.

199.    Additionally, and/or alternatively, this Court has jurisdiction over Plaintiff's and the Class's Puerto Rico labor law claims under 28 U.S.C. § 1332 because the amount in controversy for the Proposed Classes exceeds $5,000,000 and there are members of the Proposed Classes who are citizens of a different state than Defendants, as well as members of the Proposed Classes who are citizens of Puerto Rico.

200.    This Court also has jurisdiction over Plaintiffs' claims under the FLSA pursuant to 29 U.S.C. § 216(b).

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

201.     All Defendants are subject to personal jurisdiction in Puerto Rico since all Defendants transact a significant amount of business in Puerto Rico.

202.     Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce in Puerto Rico. The Defendants host baseball games, operate baseball leagues, and transact business in multiple states. The Defendants routinely use instruments of interstate commerce, such as interstate railroads, highways, waterways, wires, wireless spectrum, and the U.S. mail, to carry out their operations.

203.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because a substantial part of the events or omissions giving rise to the claims occurred in this District and were intended to and did have an effect in this District. All the Defendants transact business in this District.  Plaintiff, Daniel Concepcion, was employed by the Kansas Royals organization,  and worked for a significant period of time at  by the Kansas Royals organization, one of the conspirators, some or all of whom committed the labor law violations alleged herein in this District and/or intended their violative actions to have an effect in this District.

204.     Upon information and belief, each Franchise employs minor leaguers from Puerto Rico.

205.     All causes of action asserted in this Complaint are closely related to one another and each accrued under the same common set of facts and share a common nucleus of operative facts. Each cause of action emanates from the same uniform contract, from the same policies and practices, as applied to the same group of employees.  As detailed above, the Defendants have engaged in a long-standing and widespread violation of the FLSA. The FLSA's minimum wage and overtime requirements, 29 U.S.C. §§ 201 et seq., and the supporting regulations, apply to all Defendants and protect Plaintiffs and the class members.

206.     At all relevant times, Plaintiffs and all the minor leaguers of the proposed class were (and/or continue to be) employees within the meaning of 29 U.S.C. § 203(e) and were (and/or continue to be) employed by covered enterprises and/or entities engaged in commerce

and/or the production or sale of goods for commerce within the meaning of 29 U.S.C. §§ 203(e), (r) and (s). The work also regularly involves interstate commerce.

207.　　　At all relevant times, the Defendants jointly employed (and/or continue to employ) Plaintiffs and all similarly situated minor leaguers within the broad meaning of 29 U.S.C. §§ 203(d) and (g).

208.　　　The Defendants constructed, implemented, and engaged in a policy and/or practice of failing to pay Plaintiff and the Class and all similarly situated minor leaguers the applicable minimum wage for all hours the minor leaguers worked on behalf of Defendants, and continue to engage in such a policy and practice.

209.　　　Further, the Defendants constructed, implemented, and engaged in a policy and practice that failed to pay Plaintiff and all similarly situated minor leaguers the applicable overtime wage for all hours minor leaguers worked beyond the normal, forty-hour workweek, and continue to engage in such a policy and practice.

210.　　　Defendants also implemented and engaged in the policy and/or practice of failing to pay Plaintiff and all similarly situated minor leaguers any wages at all for many hours the minor leaguers worked on behalf of Defendants and continue to engage in such policies and practices.

211.　　　As a result of these minimum wage and overtime violations, Plaintiff and all similarly situated minor leaguers have suffered and continue to suffer damages in amounts to be determined at trial, and are entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 216(b).

212.　　　The Defendants' pattern of unlawful conduct was and continues to be willful and intentional, or the Defendants at least acted with reckless disregard. The Defendants were and are aware, or should have been aware, that the practices described in this Complaint are unlawful. The Defendants have not made a good-faith effort to comply with the FLSA with respect to the compensation of Plaintiffs and all similarly situated minor leaguers. Instead, the Defendants

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

knowingly and/or recklessly disregarded federal wage and hour laws.

213.     All similarly situated minor leaguers are entitled to collectively participate in this action by choosing to "opt-in" and submitting written Consents to Join this action. 29 U.S.C. § 216(b).

214.     In 2018, Defendants coerced and fraudulently induced Congress, with promises to maintain minor league baseball reams in the then 160 towns and cities where they were located, to pass the so-called Save America's Pastime Act (29 U.S.C. §213(a)(19)) which purported to exempt the MLB Defendants from the minimum wage, overtime and record keeping requirements. That law (exemption) is unconstitutional in that it discriminates against Plaintiff and minor league players and deprives them of equal protection of the laws, without a rational basis for doing so. As a result, Defendants' actions before and continuing after the passage of Save America's Pastime Act violate Plaintiff's and the Class's rights under the FLSA and Puerto Rico labor laws.

### Count 7: FLSA Record Keeping Requirements

215.     Plaintiff and the Class re-allege and incorporate by reference all allegations in all preceding paragraphs.

216.     The Defendants failed (and continue to fail) to make, keep, and preserve accurate records with respect to Plaintiffs and all similarly situated minor leaguers, including hours worked each workday and total hours worked each workweek, as required by the FLSA, 29 U.S.C. § 211(c), and supporting federal regulations.

217.     The lack of recordkeeping has harmed the Plaintiffs and creates a rebuttable presumption that the employees' estimates of hours worked are accurate.[65]

### VIII.     PUERTO RICO WAGE AND HOUR VIOLATIONS

218.     The Puerto Rico law Counts seek to recover for all minor league work performed by the Proposed Classes, including (but not limited to) below minimum wage compensation for

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

---

[65] *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946).

1    hours worked; hours worked in those states in excess of 40 hours per week or for no pay, and for

2    winter off-season work. Plaintiffs are informed and believe that, during the winter work periods,

3    most Puerto Rico minor league class members return to Puerto Rico where they were drafted,

4    where they reside, and where they perform some of their work without pay.

5        219.    The minor league class members are employed throughout the United states and

6    Puerto Rico, making joinder of those minor leaguers impracticable. Thus, Plaintiff is informed

7    and believes that all Defendants employed and continue to employ minor leaguers in each of the

8    states and in Puerto Rico during the relevant time periods. Upon information and belief, Plaintiff

9    further alleges that each of the Defendants violated the minimum wage and overtime laws of

10   Puerto Rico including, but not limited to below minimum wage compensation for hours worked

11   (29 LPR §250); hours worked in those states in excess of 40 hours per week and/or for no pay,

12   uncompensated winter off-season work and/or work performed during other portions of the year.

13   (29 LPR §273)

14

15              **Count 8: Puerto Rico Minimum Wage Violations**

16

17        (The Puerto Rico Class Representatives and the Puerto Rico Class Against All Defendants)

18                    (Violation of Puerto Rico 29 LPR §250)

19        220.    Plaintiff re-alleges and incorporates by reference all allegations in all preceding

     paragraphs.

20

21        221.    Failure of an employer to pay its employees the minimum wage fixed by the

22   Puerto Rico Labor Commission violates, *inter alia*, 29 LPR §250.

23        222.    Defendants failed to pay the Puerto Rico Class Representatives and Puerto Rico

24   Class Members the minimum wage for all hours worked, by requiring them to perform work

25   for less than the hourly minimum wage and for work without compensation.

26        223.    Pursuant to 29 LPR §§250 and 282, Puerto Rico Class Representatives and

27   Puerto Rico Class Members are entitled to recover in a civil action the unpaid balance of the

28

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

full amount of the minimum wage for all hours worked.

224.     29 LPR §282 provides that any employer who violates any provision regulating hours and days of work shall be subject to civil penalties. As a result of Defendants' violation, Puerto Rico Class Representatives and Puerto Rico Class Members are entitled to and hereby seek civil penalties equal to unpaid wages in an amount according to proof, plus attorney's fees and costs.

225.     Puerto Rico Class Representatives and Puerto Rico Class Members seek liquidated damages pursuant to 29 LPR §282.

226.     Puerto Rico Class Representatives and Puerto Rico Class Members seek to recover all unpaid minimum wages, penalties, and interest due to them.

227.     As a result of Defendants' conduct, Puerto Rico Class Representatives and Puerto Rico Class Members are also entitled to attorneys' fees under 29 LPR §282, in addition to interest, expenses and costs of suit.

228.     Pursuant to Puerto Rico law, the Defendants are and were required to pay the Puerto Rico Class Representatives and the Puerto Rico Class a minimum wage set by 29 LPR §250 et. seq. Puerto Rico's minimum wage requirements apply to the Defendants and protect the Puerto Rico Class Representatives and the Puerto Rico Class.

229.     The Defendants constructed, implemented, and engaged in a policy and/or practice of failing to pay the Puerto Rico Class Representatives and all of the Puerto Rico Class the applicable minimum wage for all hours they suffered or permitted the minor leaguers to work, and they continue to engage in such practices.

230.     As a result of these minimum wage violations, the Puerto Rico Class Representatives and the Puerto Rico Class have suffered (and continue to suffer) damages in amounts to be determined at trial, and are entitled to recovery of such amounts, liquidated damages, and other compensation pursuant to 29 LPR §§ 250 and 282.

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

231.     As a result of Defendants' conduct, Puerto Rico Class Representatives and Puerto Rico Class Members are also entitled to attorneys' fees under 29 LPR §282, in addition to interest, expenses and costs of suit.

232.     The Defendants pattern of unlawful conduct was and continues to be willful and intentional, or at least with reckless disregard. The Defendants were aware or should have been aware that the practices described in this Complaint are unlawful. The Defendants have not made a good-faith effort to comply with Puerto Rico's minimum wage requirements with respect to the compensation of the Puerto Rico Class Representatives and the Puerto Rico Class, and instead knowingly and/or recklessly disregarded Puerto Rico law.

**Count 9: Puerto Rico Unpaid Overtime Violations**

(The Puerto Rico Class Representatives and the Puerto Rico Class Against All Defendants)
(Violation of 29 LPR §§ 273 et. seq.)

233.     Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

234.     29 LPR § 273 provides that work in excess of eight hours in a day, or 40 hours in a week, must be compensated at a rate not less than one and one-half times the regular rate of pay for an employee.

235.     Puerto Rico Class Representatives and Puerto Rico Class Members work, or have worked, more than eight hours in a day and more than 40 hours in a week and were not paid at the overtime rate for all hours worked.

236.     Pursuant to 29 LPR §273, Puerto Rico Class Representatives and Puerto Rico Class Members are entitled to recover in a civil action the unpaid balance of the full amount of overtime compensation for all excess hours worked.

237.     29 LPR §282 provides that any employer who violates any provision regulating

hours and days of work shall be subject to civil penalties. As a result of Defendants' violations, Puerto Rico Class Representatives and Puerto Rico Class Members are entitled to and hereby seek civil penalties in an amount according to proof.

238.    Puerto Rico Class Representatives and Puerto Rico Class Members seek to recover all unpaid overtime wages, penalties, and interest due to them.

239.    Puerto Rico Class Representatives and Puerto Rico Class Members are also entitled to attorneys' fees under 29 LPR §282, in addition to penalties, interest, expenses and costs of suit.

240.    Throughout the Puerto Rico Class period, the Puerto Rico Class Representatives and the Puerto Rico Class routinely worked (and continue to work) in excess of 8 hours per workday, sometimes work(ed) in excess of 12 hours in a workday, routinely work(ed) in excess of 40 hours in a workweek, usually work(ed) 7 days in a workweek and sometimes in excess of 8 hours on the seventh day of the workweek.

241.    The Defendants failed and continue to fail to pay the Puerto Rico Class Representatives and the Puerto Rico Class overtime wages as required by 29 LPR §273.

242.    As a result of these violations, the Puerto Rico Class Representatives and the Puerto Rico Class have suffered and continue to suffer damages in amounts to be determined at trial, and are entitled to recover such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 LPR §282.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on his own and on behalf of all other similarly situated persons, seek the following relief:

1. That at the earliest possible time, Plaintiff be allowed to give notice of this collective action, or that the Court issue such notice, to members of the Minor League

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

Collective, as defined above. Such notice shall inform them that this civil action has been filed, of the nature of the action, and of their right to join this lawsuit if they believe they were denied (and/or continue to be denied) proper wages;

2.  Unpaid minimum wages and overtime wages, that have accrued and continue to accrue until the resolution of this action, and an additional and an equal amount as liquidated damages pursuant to the FLSA and the supporting regulations;

3.  Unpaid wages and pay pursuant to Puerto Rico labor laws that have accrued and continue to accrue until the resolution of this action, and liquidated damages pursuant to Puerto Rico law and supporting regulations;

4.  Statutory damages for Defendants' recordkeeping violations pursuant to federal and Puerto Rico law;

5.   Certification of the Proposed Antitrust Classes, as set forth above, pursuant to Rule 23 of the Federal Rules of Civil Procedure;

6.  Designation of the named Plaintiff herein as class representative of the Classes, designation of their undersigned counsel of record as Class Counsel, and a reasonable incentive payment to Plaintiff;

10. Pre-judgment and post-judgment interest as permitted by law;

11. An injunction requiring Defendants to pay compensatory damages for all non-competitive wages and treble damages and an order enjoining Defendants from continuing or reinstating their unlawful policies and practices as described within this Complaint;

12.     Reasonable attorneys' fees and costs of the action; and

13.     Such other relief as this Court shall deem just and proper.

14.     This Court declare the conduct of Defendants, and each of them, constituted a conspiracy and that Defendants, and each of them, are liable for the conduct of or damage inflicted by any other co-conspirator;

15.     Defendants, and each of them, be permanently enjoined from enforcing the

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

"reserve clause" which unlawfully restricts the movement by and compensation paid to, minor league players;

16.     The contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators as alleged in this complaint, be adjudged to have been a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

17.     The actions of Defendants and their co-conspirators to illegally acquire and maintain monopsony power in the relevant product market be adjudged to have been in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

18.     Judgment be entered for Plaintiffs and the Class and against Defendants for three times the amount of damages sustained by Plaintiffs as allowed by law, together with the costs of this action, including reasonable attorneys' fees, pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26;

19.     Plaintiffs be awarded prejudgment and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

20.     Defendants and their co-conspirators be enjoined from further violations of the antitrust laws;

21.     Designation of the named Plaintiffs herein as class representatives of the Class, designation of their undersigned counsel of record as Class Counsel, and a reasonable incentive payment to Plaintiffs;

22.     That the Court order and declare that the so-called business of baseball, the Curt Flood Act 15 U.S.C. §15(b)(1), (2) and the Save America's Pastime Act 29 U.S.C. §213(a)(19) are unconstitutional, void and of no effect since their enactments, and that Defendants be enjoined from further violations of said acts.

23.     Plaintiff and the Puerto Rico Class be awarded judgment and compensatory damages, penalties, interest, and attorney's fees according to proof.

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

24.     Plaintiffs and the Class have such other, further relief, as this Court may deem just and proper under the circumstances.

DATED: January10, 2022                LAW OFFICES OF SAMUEL KORNHAUSER

                                                         and

                                       LAW OFFICES OF BRIAN DAVID

                                                         and

                                       BAELLA & BAELLA


                                       By:  /s/ Rafael Baella-Silva
                                                  Rafael Baella-Silva

                                                  Attorneys for Plaintiff and
                                                  those similarly situated

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

## X.     DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury of all issues so triable.


DATED: January __, 2022                    LAW OFFICES OF SAMUEL KORNHAUSER

and

LAW OFFICES OF BRIAN DAVID

and

BAELLA & BAELLA


By:  /s/ Rafael Baella-Silva
         Rafael Baella-Silva

Attorneys for Plaintiff and
those similarly situated