# UNITED STATES DISTRICT COURT

## DISTRICT OF PUERTO RICO

DANIEL CONCEPCION,
Individually and on Behalf of All Those
Similarly Situated,

)
)
)
)

**CIVIL NO. 3:22-cv-01017-ADC**

Plaintiffs,

)
)
)

v.

)
)

OFFICE OF THE COMMISSIONER OF
BASEBALL, an unincorporated association
doing business as MAJOR LEAGUE
BASEBALL, et. al.

)
)
)
)
)
)

Defendants.

)
)
)

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST
AMENDED COMPLAINT (DOCKET NO. 35)**

Law Offices of Samuel Kornhauser
155 Jackson Street, Suite 1807
San Francisco, CA 94111

**INTRODUCTION**

The motion to dismiss filed on behalf of all the Defendants, including Allan Huber "Bud" Selig, who claims to not have been served, should be denied or, in the alternative, a decision on the motion should be stayed until after jurisdictional discovery is completed and supplemental briefing is filed.

Defendants have argued, without evidence, that none of them do substantial, continuous business in Puerto Rico, so there is allegedly no general personal jurisdiction over any of them here. Defendants have each refused to provide any discovery as to their business or other contacts with Puerto Rico (Exhibit 1) and therefore are estopped from arguing that there is no general personal jurisdiction over each of them.

There *is* general jurisdiction over each of the Defendants because each of them targeted, drafted, solicited, recruited, and hired a substantial number of Puerto Ricans to play minor league and major league baseball for Defendants. (Exhibit 2) Such targeting, and recruitment of Puerto Rican employees constitutes substantial business in Puerto Rico sufficient to confer general personal jurisdiction over each of the Defendants. *Forum Financial Group, Ltd. Liability Co. v. President, Fellows of Harvard College* 173 F. Supp. 2d 72, 87 (D. Mo. 2001); *Burger King Corp. v. Rudzewicz* 105 S. Ct. 2174, 2182 - 2184; *Travelers Health Ass'n v. Com. of Va. Ex rel. State Corp. Com'n* 339 US 643, 647

Even if, *arguendo*, Defendants' recruiting and targeting Puerto Rican young men to be minor league baseball players outside of Puerto Rico does not confer general jurisdiction, it does confer specific personal jurisdiction over each Defendant by this Court because Defendants' contacts with Puerto Rico, by targeting Puerto Rican ball players in Puerto Rico to become employees of Defendants for anti-competitive wages, is the very Puerto Rican activity that this lawsuit is about. Defendants being sued here for their violative conduct here is

Law Offices of Samuel Kornhauser
155 Jackson Street, Suite 1807
San Francisco, CA 94111

reasonable. *Villalobos v. North Carolina Growers Ass'n, Inc.* 42 F. Supp. 2d 131, 140 – 141 (D. P.R. 1999); *Forum Financial Group, Ltd. Liability Co. v. President, Fellows of Harvard College* 173 F. Supp. 2d 72, 87, 89 - 90 (D. Mo. 2001); *Densmore v. Colby-Sawyer College* 2016 WL 9405316 at *5 (Case No. 15-cv-346-JDL D. Me. March 1, 2016); *Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell v. Medfit Intern., Inc.* 982 F. 2d 686, 690 – 691 (1st. Cir. 1993); *Hahn v. Vermont Law School* 698 F. 2d 48, 51 (1st. Cir. 1983) [the purposeful actions of VLS in mailing to Hahn in Massachusetts application information and an acceptance letter were sufficient without more for personal jurisdiction]; *Pike v. Clinton Fishpacking, Inc.* 143 F. Supp. 2d 162, 167 – 168 (D. Mass. 2001); *Sarmiento v. Producer's Gin of Waterproof, Inc.* 439 F. Supp. 2d 725, 73o (S. D. Tex. 2006); *King v. Prodea Systems, Inc.* 433 F. Supp. 3d 7, 15 (D. Mass. 2019); *Bostic v. Drummond Ltd.* 2016 WL 6699204 at *6 (S. D. W. Va. 2016) [employer recruitment of forum employees confers specific jurisdiction (citing other cases holding same)]

      Contrary to Defendants' assertion, this Court has personal jurisdiction over each of the Defendants, not just the three that signed the named Plaintiffs. Under the agent/conspiracy theory of personal jurisdiction, this Court has jurisdiction over each Defendant member of the *admitted* MBL monopsony conspiracy[1] to fix, at non-competitive, below market levels and below even minimum wage levels, the compensation they (and each of them) paid and would pay to Puerto Rican minor league players (FAC[2], ¶ 2). *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.* 290 F. 3d 42, 45, 48, 52 (1st. Cir. 2002); *Ward v. Auerbach* 2017 WL 2724938 at *10 (D. Mass. 2017); *Catrone v. Ogden Suffolk Downs, Inc.* 647 F. Supp. 850, 860 (D. Mass. 1986); *Vermont Castings, Inc. v. Evans Products Company* 510 F. Supp. 940;

---

[1] Defendants do not dispute and therefore, the allegation that Defendants conspired to fix, at non-competitive levels, the compensation they paid their minor leaguers must be deemed true, at least for the purposes of the motion to dismiss.

[2] "FAC" refers to the First Amended Complaint in this case.

Law Offices of Samuel Kornhauser
155 Jackson Street, Suite 1807
San Francisco, CA 94111

*Schwab Short-Term Bond Market Fun v. Lloyds Banking Group Plc* 22 F. 4th 103, 122 – 125 (2nd Cir. 2021) [the court has personal jurisdiction over each member of the conspiracy if any member of the conspiracy committed a wrongful act (antitrust violation) in or directed at the forum] Thus, each of the Defendant teams, the Defendant association (MLB) and the commissioners who directed, controlled, and enforced the ongoing conspiracy to fix minor leaguers' wages through the reserve clause and uniform minor league player's contracts with fixed non-negotiable wages is subject to personal jurisdiction here, even if they did not have contract with this forum.

Defendants' argument that Plaintiffs' antitrust claims should be dismissed (even though Defendants admit they conspired to and did violate sections 1 and 2 of the Sherman Act by monopolizing the market for minor league baseball players and by fixing at anti-competitive levels, the compensation they paid Plaintiffs and the class) because they are supposedly "exempt" from the antitrust laws, is without merit. There is nothing in the Sherman Act or federal antitrust laws that "exempts" major league baseball teams or the MLB from the federal antitrust laws. Any judicially created exemption was recently called into serious doubt in the *NCAA v. Alston* (2021) 141 S. Ct. 2141case. The *Federal Baseball. Toolson , Flood* trilogy of cases were clearly erroneous from the start, were not and are not now good law. *Dobbs, State Health Officer of The Mississippi Department of Health, et al. v. Jackson Women's Health Organization et al.* 2022 WL 2276808 at *7

Defendants' arguments that Plaintiffs' and the class's antitrust claims are barred by the four (4) year statute of limitations are also wrong. Aldemar Burgo's anti-competitive contract and fixed wage payments ran through December 31, 2018, so he had until December 31, 2022, to file his antitrust claim. He did so, at the latest, on June 5, 2022, well before December 31, 2022. The same is true for Sidney Dupre Conde. He received below market payments through August of 2019, so he had until August 2023 to file his antitrust claim. As for Mr. Concepcion,

his claims were tolled from 2016 through January 20, 2018 because of a pending class action case in *Miranda v. Commissioner of Baseball*. He filed his antitrust action within four (4) years of February 20, 2018, i.e., on January 5, 2022.

Defendants' argument, that they are not all liable for their conspiracy to violate the FLSA laws because only three (3) Defendants were employers of Plaintiffs, is without merit. Where, as here, the defendants conspired to and did violate FLSA minimum wage and overtime laws, they are all liable for the acts of any of them in furtherance of the conspiracy. *Daynard v Ness, Motley, Loadholt, Richardson & Poole, P.A.* 290 F. 3d 42 (1st. Cir. 2002)

## I.    STATEMENT OF PERTINENT FACTS

Plaintiffs have alleged that they and other Puerto Rican minor leaguers were scouted, targeted, and recruited by Defendants in Puerto Rico to sign, and did sign, contracts in Puerto Rico which contracts violated the federal antitrust laws.

Defendants and each of them admittedly conspired and agreed among themselves to use their monopoly power in the market for professional minor league baseball (Defendants are the only game in town. There are no other professional minor leagues.) to fix wages at below market rates, i.e., the compensation they pay their minor leaguers who reside in Puerto Rico. (FAC, ¶ 2)

Defendants further conspired and agreed to further restrict competition, and to suppress the wages paid to minor leaguers, including Puerto Rican minor leaguers, by coercing all minor leaguers to sign employment contracts that bound them to the one team that drafted them and set wages using the same wage scale for all minor leaguers, including Puerto Rican minor leaguers. (FAC, ¶ 4)

MLB is a $12.4 Billion business, and each Defendant team is wealthy. (FAC, ¶¶ 100-101)

Law Offices of Samuel Kornhauser
155 Jackson Street, Suite 1807
San Francisco, CA 94111

Defendants acquire minor leaguers through their draft. Many of the drafted minor leaguers are Puerto Rican. They reside in Puerto Rico and are drafted in Puerto Rico. (FAC, ¶ 8) They are scouted by Defendants at training facilities in Puerto Rico. (FAC, ¶ 13) Many of the Latino minor leaguers come from poor families. (FAC, ¶ 13) The salaries paid to minor leaguers are fixed by Defendants and enforced by the Commissioner. (FAC, ¶¶ 24-30) (Each Defendant is required to pay their minor leaguers the agreed upon fixed wages.)

Plaintiff, Daniel Concepcion, was drafted by the Kansas City Royals and played minor league baseball for depressed, anti-competitive wages from 2010 through 2016. He performed work training and conditioning in Puerto Rico, often without pay. He was drafted in Puerto Rico. He agreed to the anti-competitive contract terms in Puerto Rico. He received the contract and annual renewals in Puerto Rico at his Puerto Rico address and received compensation In Puerto Rico. (FAC, II, 1, A)

The same was true for Plaintiff Aldemar Burgos except that he was drafted by the San Diego Padres and played for them. Mr. Burgos  was scouted, recruited, and drafted from the Carlos Beltran Baseball Academy in Puerto Rico. He played but was paid fixed wages, below market, and below minimum wage from 2016 through August of 2019. (FAC, II, 1, B)

The same was also true for Plaintiff Sidney Duprey Conde. He is a resident of Puerto Rico and was a resident of Puerto Rico when he was drafted by the San Francisco Giants. He played minor league baseball and was paid anti-competitive wages by the Giants until after the 2018 season. (FAC, II, 1, C)

Defendants transact a substantial amount of business in Puerto Rico and committed the antitrust, FLSA and Puerto Rico wage violations in Puerto Rico, and intended them to have an effect in Puerto Rico. (FAC, ¶¶ 97 and 98)

Latin minor leaguers comprise 40% of the minor leagues. (FAC, ¶ 112)

Defendants' violative actions are continuing through today.

Law Offices of Samuel Kornhauser
155 Jackson Street, Suite 1807
San Francisco, CA 94111

## II. THIS COURT HAS PERSONAL JURISDICTION OVER EACH OF THE DEFENDANTS BECAUSE THEY PURPOSELY RECRUITED AND HIRED PUERTO RICAN MEN TO BE THEIR MINOR LEAGUE (ANDMAJOR LEAGUE) BASEBALL PLAYER EMPLOYEES

### A. General Jurisdiction

Defendants first argue that this Court has no general personal jurisdiction over any of them because Plaintiffs have not alleged that any of their affiliations with Puerto Rico are so "continuous and systematic" as to render them "at home" here. (Docket No. 51, p. 16 0f 42) Defendants are wrong. Plaintiffs have alleged and provided evidence that each of the Defendants employ scouts in Puerto Rico or sends scouts to Puerto Rico to evaluate and solicit young, talented Puerto Rican baseball players to be minor leaguers for their minor league teams. (FAC, ¶ 13) Plaintiffs have also alleged and provided evidence that Defendants hold an annual minor league draft where they target and select specific Puerto Rican baseball players to be minor league baseball players for the team that recruited them. Plaintiffs have also alleged and provided evidence that each Defendant then recruits and hires these Puerto Rican players in Puerto Rico by making them sign monopsonist, wage-fixed contracts. Plaintiffs have also alleged and provided evidence that Defendants purposely target and recruit Puerto Rican residents in Puerto Rico to work out of state which subjects Defendants to the general, personal jurisdiction of this forum. *Forum Financial* supra 173 F. Supp. 2d at 87

Defendants cite a number of inapposite cases (at Docket No. 51 at pp. 17 of 42 and 18 of 42) where the court declined general, personal jurisdiction over an out of state sports team that did some business in the forum state. However, in none of those cases did the out of state defendant directly target or recruit residents of the forum to be out of state employees for the defendant.

### B. Specific Personal Jurisdiction

Law Offices of Samuel Kornhauser
155 Jackson Street, Suite 1807
San Francisco, CA 94111

The most common method for determining whether the plaintiff has met his burden of proving the court's personal jurisdiction is the *prima facie* method, which allows the district court to consider only whether the plaintiff has proffered evidence that, if credited, is sufficient to support all of the findings of fact essential to personal jurisdiction. *Rosario Velez v. Palladio Beauty Group, Inc.*, No. 11-cv-1114, 2012 WL 12995633 at *2 (D.P.R., Mar. 30, 2012). The court takes as true the specific facts alleged affirmatively by the plaintiff, and construes them in the light most favorable to the plaintiff's jurisdictional claim. *Lang v. Corporacion de Hoteles, S.A.*, 522 F.Supp.2d 349, 358 (D.P.R. 2007); *Gonzalez-Lopez v. CIGNA Group Insurance*, 609 F.Supp.2d 161, 166 (D.P.R. 2008).

Specific jurisdiction exists when there is a demonstrable nexus between a plaintiff's claims and a defendant's forum-based activities, such as when the litigation itself is founded directly on those activities. *Ruiz-Sanchez v. Goodyear Tire & Rubber Co.*, No. 10-cv-1509, 2011 WL 4709875 at *3 (D.P.R. Sep. 30, 2011). The reviewing court must determine (1) whether the defendant purposefully directed activities at residents of the forum, (2) whether the claims arise out of or relates to those activities, and (3) whether assertion of personal jurisdiction is reasonable and fair. *Canatelo, LLC v. NUVICO, Inc*., No. 12-cv-1430, 2013 WL 4546017 at *2 (D.P.R., Aug. 27, 2013).

**1.    The Claims Relate to and Arise Out of Defendants' Purposeful Recruitment of Puerto Rican Ball Players in Puerto Rico**

In order for specific personal jurisdiction over the Defendants to exist, Plaintiffs' claims must arise from or relate to Defendants' actions in or directed to Puerto Rico. It does here. Plaintiffs are bringing antitrust and related claims that arise out of Defendants' targeting Puerto Rican residents to agree to contract to work under anti-competitive contracts.

Defendants and each of them, in order to obtain employees to be minor league baseball

players (employees) for their minor league teams, targeted and recruited residents of Puerto Rico and forced them to sign contracts in Puerto Rico and indenture themselves in Puerto Rico to become employees bound by these illegal contracts. Plaintiffs' claim is that being forced to enter into these non-competitive monopsonist contracts violates the antitrust laws. Those antitrust claims arise directly out of Defendants' activities in Puerto Rico, i.e., purposefully targeting, soliciting, recruiting, and coercing these Puerto Rican Plaintiffs in Puerto Rico. Directly targeting and recruiting employees in the Puerto Rico forum confers specific personal jurisdiction over the recruiting teams regardless of where the employee's (ball player's) work is performed or where he is paid. *Villalobos* supra, *Forum Founders* supra.

## 2.      Defendants Purposefully Availed Themselves of the Benefits of Puerto Rico

Defendants argue that this Court does not have specific jurisdiction over any of them because Plaintiffs have not alleged that Defendants purposefully availed themselves of the benefits of doing business in Puerto Rico or that exercise of jurisdiction over them is reasonable. (Docket No. 51, pp. 18 of 42 – 23 of 42) Defendants are wrong and ***they*** ignore Defendants' antitrust and FLSA actions here in Puerto Rico that are at the heart of this case.

This Court and the courts in the First Circuit have consistently held that specific personal jurisdiction exists where, as here,  an out of state employer or entity directly recruits or targets or directly solicits forum state citizens or residents to work or engage in activities in a non-forum state. *Villalobos v. North Carolina Growers Ass'n, Inc.* 42 F. Supp. 2d 131, 134 (D. P.R. 1999); *Densmore v. Colby-Sawyer College* 2016 WL 9405316 at *5 (Case No. 15-cv-346-JDL D. Me. March 1, 2016); *Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell v. Medfit Intern., Inc.* 982 F. 2d 686, 690 – 691 (1st. Cir. 1993); *Hahn v. Vermont Law School* 698 F. 2d 48, 51 (1st. Cir. 1983) [the purposeful actions of VLS in mailing to Hahn in Massachusetts applicable information and an acceptance letter were sufficient without more for personal

Law Offices of Samuel Kornhauser
155 Jackson Street, Suite 1807
San Francisco, CA 94111

jurisdiction]; *Pike v. Clinton Fishpacking, Inc.* 143 F. Supp. 2d 162, 167 – 168 (D. Mass. 2001); *Sarmiento v. Producer's Gin of Waterproof, Inc.* 439 F. Supp. 2d 725, 73o (S. D. Tex. 2006); *King v. Prodea Systems, Inc.* 433 F. Supp. 3d 7, 15 (D. Mass. 2019); *Bostic v. Drummond Ltd.* 2016 WL 6699204 at *6 (S. D. W. Va. 2016) [employer recruitment of forum employees confers specific jurisdiction (citing other cases holding same)]; *Forum Financial Group, Ltd. Liability Co. v. President, Fellows of Harvard College* 173 F. Supp. 2d 72, 87, 89 - 90 (D. Mo. 2001)

In *Villalobos v. North Carolina Growers Association, Inc.*, Puerto Rican migrant workers filed suit in this Court, claiming that they had been recruited and hired for agricultural jobs in North Carolina only to encounter widespread noncompliance with the promises made to them at the time of their recruitment. The plaintiffs in *Villalobos* sought relief for the mainland employers' false and misleading disclosures and their failure to comply with the working arrangement.  42 F.Supp.2d 131, 134 (D.P.R. 1999).

This Court upheld exercise of jurisdiction in the Commonwealth, observing that the farmworkers' claims were related to the alleged violations of their rights in Puerto Rico and that the farmers "reasonably should have known that recruitment was likely to take place in Puerto Rico, a traditional recruiting spot for agricultural workers." 42 F.Supp.2d at 140. Finally, this Court concluded that it was reasonable to force the North Carolina growers to defend in Puerto Rico, because of the Commonwealth's strong interest in adjudicating disputes for Puerto Ricans for harms inflicted by out-of-state actors who recruit in Puerto Rico. 42 F.Supp.2d at 141.

In *Forum* supra 173 F. Supp. 2d at 87, personal jurisdiction existed because the Massachusetts employer defendant targeted and recruited the Maine plaintiff in the Maine forum for employment outside Maine. In *Hahn* supra 698 F. 2d at 51, the Vermont Law School solicited and recruited (accepted) the Massachusetts prospective law student in Massachusetts to attend law school in Vermont. In *Bostic* supra 2016 WL 6699204 at *6, personal jurisdiction existed because the out of state employer recruited West Virginia residents to work for it out of state.

**a.  Defendants Purposely Directed Their Employment Recruitment Activities at Residents of Puerto Rico**

The purposeful availment inquiry is designed to ensure that personal jurisdiction is not premised solely on a defendant's random or isolated contacts with the forum. *A Corp. v. All American Plumbing, Inc.*, 812 F.3d 54, 60 (1st Cir. 2016). In order to establish personal jurisdiction, the contacts must be the result of a purposeful act by the defendant. *Ramos v. Hyundai Motor Co.*, 431 F.Supp.2d 209, 214-15 (D.P.R. 2006).

Defendants argue that they did not purposefully avail themselves of the privileges of conducting activities in Puerto Rico. (Docket No. 51, pp. 19 of 42 through 22 of 42) They ignore the fact, which they do not dispute, that they targeted and recruited Plaintiffs and many

Law Offices of Samuel Kornhauser
155 Jackson Street, Suite 1807
San Francisco, CA 94111

other Puerto Rican ball players to be their minor league ballplayer employees, i.e., Defendants "reached into" Puerto Rico to "recruit" ball players and "plucked" Puerto Ricans out to fulfill Defendants' employee needs. *Bostic* supra at *5  These Puerto Rico recruiting and drafting actions were not "fortuitous" "random" actions. They were purposeful and deliberate. Defendants knew these ballplayer employees were from Puerto Rico and recruited them from Puerto Rico and contracted with them here. Defendants knew or reasonably should have expected that they would be "haled" into court in Puerto Rico, by Puerto Ricans they had recruited and drafted, and then harmed as a result of (but for) that targeted recruitment which caused them to be bound by antitrust, violative contracts. Defendants knew that if there were a dispute about the validity of those illegal, monopsonist contracts, they would be sued in Puerto Rico. These were voluntary acts by Defendants and by their co-conspirator agents[3] in purposely recruiting these and other Puerto Rican ball players.

Defendants' citation to *Collyard v. Washington Capitals* 477 F. Supp. 1247, 1250 n. 3 (D. Minn. 1979) as support for the supposed proposition that scouting (hockey) players in the forum does not meet the "related to" (or purposeful availment)  prong for personal jurisdiction. (Docket No. 51, p. 19 of 42, n. 5) *Collyard* made no such holding. To the contrary, *Collyard* 477 F. Supp. 1247 at 1250 n. 3 notes that there was no scouting of hockey players in Minnesota by defendant. The case implies that, if there had been scouting of Minnesota hockey players in Minnesota, there could personal jurisdiction in Minnesota under its long arm statute for minimum contacts. [There is no claim . . . that Plaintiffs were scouted by any . . . defendant in Minnesota. Thus, there have been no actions by Defendants in Minnesota upon which jurisdiction over them can be based."] *Collyard* thus supports

---

[3] Because Defendants and each of them conspired to carve up and distribute among themselves the market for minor league ball players by way of an annual fixed draft, they were agents for each other and are liable for the antitrust (and FLSA and wage law) violations committed by other co-conspirators in Puerto Rico under and agency/ conspiracy theory of personal jurisdiction. (See infra at pp. _____ )

Law Offices of Samuel Kornhauser
155 Jackson Street, Suite 1807
San Francisco, CA 94111

Plaintiffs' position here, that scouting and recruiting forum residents *does* confer personal jurisdiction. That is the law in the First Circuit. *Forum Foundation* supra. *Villalobos* supra.

Defendants further mislead by citing *Macamaux v. Millard* 2009 WL 210455 (D. R. I. Jan. 28, 2009) for the supposed proposition that recruiting in Rhode Island did not confer personal jurisdiction. In the *Millard* case, the Plaintiff asserted that the Connecticut Hospital's generalized solicitation of Rhode Island residents as Hospital employees was sufficient to confer general personal jurisdiction in Rhode Island for his medical malpractice claim. The court held that this generalized (not targeting specific Rhode Island residents for hiring as physicians in Connecticut) was not enough for *general jurisdiction.* However, where, as here, the defendant purposefully targets specific persons in the forum and recruits them to be employees of the Defendants, there is personal jurisdiction because it is the purposeful act of the defendant to target and recruit persons in the forum state. *Villalobos* supra at 140-141; *Hahn* supra at 51; *Forum Financial* supra at 87, 89-90; *Pike v. Clinton Fishpacking, Inc.* 143 F. Supp. 2d 162, 167 – 168 (D. Mass. 2001) [Washington company solicited fisherman in Massachusetts to fish in Alaska. Massachusetts plaintiff fisherman injured in Alaska – personal jurisdiction over Washington boat owner in Massachusetts.] ["there can be no doubt that defendant's decision to contract with {Massachusetts} plaintiff for employment was a first step in his alleged injury . . . defendant's decision to accept the plaintiff's employment (although he signed on in Alaska) formed a part of the overall purposeful solicitation of employees from Massachusetts. It simply strains the literal requirements of the long arm statute to suggest that a foreign corporation can continuously and substantially contract with Massachusetts residents for employment in Alaska and then seek to avoid personal jurisdiction in Massachusetts . . ."]

Defendants' argument that they recruit and hire ball players from many other states does not negate the fact that they purposefully recruited and hired Plaintiffs and a substantial

Law Offices of Samuel Kornhauser
155 Jackson Street, Suite 1807
San Francisco, CA 94111

number of other specific players from Puerto Rico. *Villalobos* supra

Defendants argue that the named Plaintiffs residing in Puerto Rico and receiving compensation in Puerto Rico from the three (3) teams (Giants, Padres and Kansas City Royals) that employed them, and who were drafted in Puerto Rico where they signed their minor league contracts and performed some of their work (training and conditioning) in Puerto Rico, is not enough to constitute purposefully availing themselves of doing business in or obtaining the benefits of Puerto Rico. Defendants are wrong and again mischaracterize the law. As set forth above, it is the purposeful targeting and recruitment of specific, talented young Puerto Rican ball players residing here in Puerto Rico, and then soliciting, recruiting, and hiring them through the draft[4], by which Defendants purposefully avail themselves of the benefits of doing business in Puerto Rico. *Villalobos* supra; *Hahn* supra; *Pike* supra

Where, as here, the antitrust wage fixing violation results in periodic, violative payments, the four (4) year statute of limitations starts anew with each violative payment, i.e., each time the plaintiff is injured. *Xechem v. Bristol-Meyers Squibb Co.* 372 F. 3d 899, 902 (7th Cir. 2004) [the period of limitations for antitrust litigation runs from the most recent injury caused by defendant, not from the violation's inception]; *Klehr v. AO Smith Corp.* 521 US 179, 188-191 (1997)[5]

Moreover, in antitrust class action cases such as this, courts will not consider the standing issue prior to deciding class certification. *In re Chocolate Antitrust Litigation* 602 F. Supp. 2d 538

---

[4] Defendants attempt to confuse the issue by arguing that the draft does not physically take place in Puerto Rico. However, the physical location of the draft does not diminish the fact that Defendants target specific Puerto Ricans in Puerto Rico for employment and thereby purposefully avail themselves of the benefits of Puerto Rico..

[5] Defendants' reliance on *Danton v. Innovative Gaming Corp.* 246 F. Supp. 2d 64 (D. Maine 2003) is misplaced. Danton unremarkably held that a personal jurisdiction analysis looks at the defendants' existing contracts with the forum as of the time the lawsuit is filed, but the court must also look at the events at the time of the contacts with the forum. In either case, Defendants' continuing violations occurred within the limitation periods.

Law Offices of Samuel Kornhauser
155 Jackson Street, Suite 1807
San Francisco, CA 94111

In sum, Defendants purposely availed themselves of the benefits of Puerto Rican business by their own knowing actions in targeting and recruiting Puerto Rican ball players residing in Puerto Rico[6].

### 3.  Personal Jurisdiction Over Defendants in Puerto Rico Is Reasonable and Fair

The third factor for establishing specific personal jurisdiction is that jurisdiction in the forum is reasonable. To establish that the exercise of *in personam* jurisdiction is fair, the Court must consider the five "*gestalt*" factors identified by the Supreme Court:  (1) the defendant's burden of appearing [in the forum], (2) the [forum's] interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

*Plixer International, Inc. v. Scrutinizer GmbH*, 905 F.3d 1, 12 (1st Cir. 2018).

With regard to the first gestalt factor, Defendants bear the burden of showing that the exercise of jurisdiction would be unreasonable.  *Id.*  Staging a defense in a foreign jurisdiction is usually inconvenient or costly.  To be "constitutionally significant," Defendants must demonstrate special or unusual circumstances that render its appearance in Puerto Rico unreasonably burdensome.  *Pritzker v. Yari*, 42 F.3d 53, 64 (1st Cir. 1994).  The need for travel between the mainland and Puerto Rico "creates no especially ponderous burden."  *Id.* Defendants are wealthy and can easily afford to litigate here. Furthermore, the burden on the Defendants should be considered in light of the burden on the Plaintiffs, who

---

[6] Defendants misstate the facts in claiming that they did not direct Plaintiffs and/or the class to perform work in Puerto Rico. (Docket No. 51, p. 21 of 42) Defendants did. They required Plaintiffs and the class to perform conditioning and training at home, which Defendants knew was in Puerto Rico, to improve their skills before and after the season. (FAC, ¶ __) Training in Puerto Rico was not "fortuitous". Defendants knew that when they targeted and specifically recruited Puerto Rican players who resided in Puerto Rico, they would do their off-season training work here. *Harlow v. Childs Hospital* 432 F. 3d 50 (1st. Cir. 2005) is not to the contrary. Defendants knew they were targeting Puerto Rican resident ball players and that they were forcing them to [perform work in Puerto Rico on terms and conditions that violated the antitrust laws and FLSA and Puerto Rico wage laws. Thus, they had fair warning that they could be sued in Puerto Rico.

Law Offices of Samuel Kornhauser
155 Jackson Street, Suite 1807
San Francisco, CA 94111

are mostly poor, working for fixed, below minimum wages and could not afford to travel and stay away from home. *Ochoa*, 287 F.3d at 1192.

Defendants have not shown any "special or unusual burden" that would make their appearance in Puerto Rico unduly burdensome. *Villalobos*, 42. F.Supp.2d at 141. By contrast, the Plaintiffs will be severely hampered if they are forced to litigate their claims somewhere on the mainland. *Gonzales Moreno,* 182 F.Supp.2d at 590; *Ochoa*, 287 F.3d at 1193 (noting the relative disparity in burdens between the forum-based workers and the nonresident employer).

As to the second gestalt factor, as this Court recognized in *Villalobos*, Puerto Rico has a strong interest in adjudicating disputes involving Puerto Rican workers who, based on recruitment activities conducted in Puerto Rico, travel to the mainland.  42 F.Supp.2d at 141. *See also Ochoa*, 287 F.3d at 1193 (forum state "undoubtedly has a strong interest in protecting its citizens from injury and in furnishing a forum where their injuries may be remedied"); *Moreno*, 243 F.R.D. at 272 (forum state "has an interest in protecting its citizens from nonresident employers, particularly when its citizens are the targets of recruitment for out-of- state employment"); *Astorga v. Connleaf, Inc.*, 962 F. Supp. 93, 96 (W.D. Tex. 1996) (forum state "has a significant interest in preventing its citizens from being exploited by out-of-state employers").

The third gestalt factor also supports this Court's exercise of *in personam* jurisdiction over Defendants.  Puerto Rico is a convenient forum for litigating these claims. *Gonsalez Moreno*, 182 F.Supp.2d at 596.  Like the farmworkers in *Villalobos*, the ball players "have a strong interest in obtaining convenient and effective relief for their wrongs." 42 F.Supp.2d at 141.  Requiring them to pursue their claims in outside Puerto Rico may prevent them from pursuing their claims at all.  *Moreno*, 243 F.R.D. at 272, n.4.

With respect to the fourth gestalt factor, as this Court observed in *Villalobos*, "the judicial system's interest in obtaining the most effective resolution of the controversy weighs in favor" of the exercise of personal jurisdiction, "as the act of recruiting occurred in Puerto Rico and the Plaintiffs are Puerto Rico residents." *Villalobos* 42 F.Supp.2d at 141.

Finally, the fifth gestalt factor favors the exercise of jurisdiction in Puerto Rico because "such a practice promotes the substantive social policies of holding employers engaged in interstate commerce accountable in all jurisdictions in which they solicit employees." *Villalobos*, 42 F.Supp.2d 141.

**4.     Personal Jurisdiction Over All Defendants Under the Agency/Conspiracy Theory**

Where, as here, the Defendants are part of a conspiracy, the acts of one or more conspirators in furtherance of the violative conspiracy directed at and having the conspiracy's effect in the forum, are binding on all conspirators (effectively making them agents for each other) and subjects all of them to the specific personal jurisdiction of this Court. *Greater Newburyport Clamshell Alliance v. Public Service Company of New Hampshire 1983* WL 489274 at *2 (D. Mass. 1983):

> This rule, derived from
> the notion that the acts of a conspirator in furtherance
> of a conspiracy may be attributed to the members of the
> conspiracy in order to establish personal jurisdiction, has
> recently been stated in this District as follows:
>
> While the mere presence of a conspirator within the
> forum state is not sufficient to permit personal jurisdiction

Law Offices of Samuel Kornhauser
155 Jackson Street, Suite 1807
San Francisco, CA 94111

over the non-resident co-conspirators, certain additional connections between the conspiracy and the forum state will support the exercise of jurisdiction. These additional connections exist where (1) substantial acts in furtherance of the conspiracy are performed in the forum state and (2) the co-conspirator knew or should know that the acts would be performed there.

*Van Schaick v. Church of Scientology of California, Inc.,* 535 F. Supp. 1125, 1132 (D.Mass.1982), *see* cases cited therein.

Accord *Daynard* supra 290 F.3d 55 – 56; *Duggan v. Martorello* 2022 WL 952183 at *11

 (D. Mass. March 30, 2022); *Winnie v. National Collegiate Student Loan Trust* 228 FSupp3d

141, 150 (D. Maine 2017)

Defendants' argument that the Agency/Conspiracy personal jurisdiction theory is not recognized in the First Circuit is incorrect. See the cases above. The First Circuit has not ruled one way or the other, but in *Daynard* supra, the First Circuit did endorse the agency theory of personal jurisdiction which is essentially the same as the conspiracy theory, i.e., conspirators are agents for each other and therefore subject to personal jurisdiction if the agent is  subject to personal jurisdiction. Conspiracy personal jurisdiction was also reaffirmed by the Second Circuit in *Schwab* 22 F. 4th 103, 122-125

Law Offices of Samuel Kornhauser
155 Jackson Street, Suite 1807
San Francisco, CA 94111

### III.   FORMER COMMISSIONER SELIG SHOULD NOT BE DISMISSED

Mr. Selig should not be dismissed. He is represented by counsel, including Elise Bloom, who represents all other Defendants in this action. Mr. Selig has appeared in this action twice through his counsel, Ms. Bloom, and has twice moved to dismiss the Complaint and the First Amended Complaint. Ms. Bloom agreed to and did waive service on the League and all Defendants except the Baltimore Orioles Defendants. On March __, 2022, she agreed by email to waive service on behalf of the League . . . and all Defendants except the Baltimore Defendants. On his instructions, Mr. Kornhauser's office prepared 36 separate Waivers for each named Defendant, except the two Baltimore Orioles Defendants, bundled them, and sent the packet to Defendants' counsel. Mr. Kornhauser did not closely inspect the bundle of Waivers or match them against all of the named Defendants to be sure that the bundle included a Waiver for each named Defendant, except the Baltimore Defendants (who were each personally served at a later date). That was a mistake on Mr. Kornhauser's part. No Waiver for Mr. Selig was prepared or included in the bundle of Waivers sent to Ms. Bloom, although a Waiver was sent and executed for Commissioner Manfred. If Commissioner Selig is dismissed for failure to timely serve him, it must be without prejudice. Plaintiffs will have to file a separate complaint and serve him.

Law Offices of Samuel Kornhauser
155 Jackson Street, Suite 1807
San Francisco, CA 94111

## IV.   PLAINTIFFS' AND THE CLASS' ANTITRUST CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

Defendants argue that each of Plaintiffs' and the class's claims are barred by the statute of limitations. Defendants are wrong because Plaintiffs' and the class's antitrust claims are continuing wage fixing each time an anti-competitive wage payment is made (or not paid for work done). *Klehr v. AO Smith Corp.* 521 US 179, 189 (1997) ["Antitrust law provides that in the case of a "continuing violation", say a price-fixing conspiracy that brings about a series of unlawfully high-priced sales over a period of years, each overt act that is part of the violation and injures the plaintiff", e.g., each sale to the plaintiff,  starts the statutory period running again regardless of the plaintiff's knowledge of the alleged illegality at much earlier times"] Accord *In re Relafen Antitrust Litigation* 286 F. Supp. 2d 56, 62 (D. Mass. 2003); *Xechem v. Bristol-Meyers Squibb Co.* 372 F. 3d 899, 902 (7th Cir. 2004) [the period of limitations for antitrust litigation runs from the most recent injury caused by defendant, not from the violation's inception].

Thus, a separate antitrust claim accrued for Mr. Conde who ended playing (working) and received his last violative, fixed wage in August 2019, so the four-year statute of limitations (15 U.S.C. § 15b) began to run in August 2019 and he filed his antitrust claim on June 5, 2022, well within the four (4) year deadline of August 2023.

Mr. Burgos received his last fixed wage payment in late 2018 (December 2018 which started the four-year statute of limitations, so he had until late December of 2022 to file his antitrust claim. He filed his antitrust claim, at the latest, on June 5, 2022, well before the four-year statute expired. Accord *Zenith Radio Corp. v. Hazeltine Research, Inc.* 91 S. Ct. 795, 806

Law Offices of Samuel Kornhauser
155 Jackson Street, Suite 1807
San Francisco, CA 94111

As to Daniel Concepcion, his "work" ended at the end of 2016. However, his antitrust claims were tolled during the period from December 2016 through February 20, 2018, when the Supreme Court finally denied certiorari in *Miranda v. Selig* 138 S. Ct. 1045 (February 20, 2018) It was only on February 20, 2018, when the *Miranda* antitrust class action against Defendant MLB was denied and the denial of the antitrust claim became known as final that Mr. Concepcion's antitrust claim ceased to be tolled. Until then, it was possible that the Supreme Court would hold that there is no "business of baseball" exemption (as it has recently indicated in *NCAA v. Alston* 141 S. Ct. 2141, 2159 (2021)). Where it is unclear that the defendants' actions are a violation of the antitrust laws, the statute of limitations does not begin to run, i.e., the antitrust cause of action does not yet accrue. *American Pipe and Construction Co. v. Utah* 94 S. Ct. 756, 766; *Crown, Cork & Seal Co. Inc. v. Parker* 103 S. Ct. 2392, 2397 (1983) Mr. Concepcion was a putative class member in the *Miranda* antitrust class action. Class certification was never denied, so the statute of limitations on the putative class members' claims (including Mr. Concepcion's) were tolled until the appeals were finally denied on February 20, 2018. Since his antitrust claim against Defendants did not "accrue"  until his last payment in December 2016 and the statute of limitations was tolled on his claim until February 20, 2018, when the four year statute first began to run, he had until February 20, 2022 to file his antitrust claim. He timely filed it on January 5, 2022. (Docket No. 1)

Law Offices of Samuel Kornhauser
155 Jackson Street, Suite 1807
San Francisco, CA 94111

Defendants argue that the filing of the *Miranda* antitrust class action did not toll the statute of limitations for putative class members unless they intervened or filed their own antitrust action after class certification was denied. That is what Mr. Concepcion timely did. Indeed, class certification was never denied in *Miranda*. *In re Issuer Plaintiff Initial Public Offering Antitrust Litigation* 2002 WL 31132906 at *4 (S. D. N. Y. 2002) So, Defendants' argument that denial of class certification stops the tolling of the antitrust claim (and Defendants' misleading and inapposite citation to *Fernandez v. Chardon* 681 F. 2d 42 (1st. Cir. 1982)) (Docket No. 51, pp. 26 of 42 and 27 of 42) is irrelevant where, as here, there was no denial of class certification, and a dismissal without a denial of class certification does not end the tolling. *In re Issuer* supra at *4

Defendants' reliance on *In re Celexa & Lexapro* 915 F. 3d 1 (1st. Cir. 2019) is equally inapposite. It has no application to Mr. Conde's and Mr. Burgos's class action antitrust claims here because they were not members of the *Miranda* class and they do not claim their antitrust claims were tolled by the *Miranda* putative class action. Their class action antitrust claims are timely without any tolling, so they are not "piggybacking" on the prior tolling. They are asserting class action claims not based on prior class tolling. As for Mr. Concepcion, he can still pursue his antitrust claims and can pursue continuing antitrust class claims which were not tolled between January 5, 2022 and February 20, 2022.

## V.   PLAINTIFFS' FLSA CLAIMS ARE NOT BARRED BY THE THREE YEAR STATUTE OF LIMITATIONS

Defendants concede that Mr. Bugos's FLSA claims are not barred by the three year statute of limitations since he received below minimum wages through August 2019 and filed his FLSA claim here on June 5, 2022.

Law Offices of Samuel Kornhauser
155 Jackson Street, Suite 1807
San Francisco, CA 94111

## VI. THERE IS NO VALID "BUSINESS OF BASEBALL EXEMPTION" FROM THE ANTITRUST LAWS

Defendants' argument, that Plaintiffs' antitrust claims are barred by a so-called "business of baseball exemption" is without merit, especially after the United States Supreme Court's decision in *NCAA v. Alston* (2021) 141 S. Ct. 2141, 2159 stated that any court created "exemption" for baseball that the Supreme Court might have *once* "dallied with" was "unrealistic", "aberrational" and "inconsistent" with the antitrust laws. Neither the Sherman Act nor the Clayton Act create an exemption from the antitrust laws. The recent unanimous United States Supreme Court made clear in *NCAA v. Alston* its belief that a business of baseball exemption does not and never should have existed. *Id.*

The Supreme Court in *NCAA v. Alston* 141 S. Ct. 2141, 2167 (2021) (Cavanaugh concurring) recently reiterated that principle:

> Price fixing labor is price fixing labor. And price fixing labor is ordinarily a textbook antitrust problem because it extinguishes the free market in which individuals can otherwise obtain fair compensation for their work.

Law Offices of Samuel Kornhauser
155 Jackson Street, Suite 1807
San Francisco, CA 94111

– 22 –

The courts, including the Supreme Court, have repeatedly held that it is a violation of section 1 of the Sherman Act, 15 U.S.C. § 1, and section 4 of the Clayton Act, 15 U.S.C. § 15, for competitors to conspire to fix the compensation paid to employees in a sports or entertainment industry. *Radovich v. National Football League*, 352 U.S. 445, 451-452 (1957) [were we considering the question of baseball for the first time upon a clean slate we would have no doubts]; *Mackey v. National Football League*, 543 F.2d 606, 617 (8th Cir. 1976) [citing cases in other professional sports where conspiracies to suppress player compensation held to violate antitrust laws.]

It is highly likely given the Supreme Court's recent signal in *Alston,* that it is ready to correct its own mistake and eliminate the :business of baseball" exemption from the antitrust laws.

*Stare decisis* is not a barrier to overturning a long-standing, established, widely relied on case. A few days ago, the Supreme Court in *Dobbs v. Jackson Women's Health* 2022 WL 2276808 at *7 overturned its long-established decision in *Roe v. Wade* because a majority held that a prior decision that was egregiously wrong on the day it was handed down, should be overturned. The same applies for the "business of baseball" trilogy of cases.

A core principle underlying *stare decisis* is that courts do not make the law, but rather declare what the law is. *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 549 (1991); *Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.).

Law Offices of Samuel Kornhauser
155 Jackson Street, Suite 1807
San Francisco, CA 94111

Consequently, "precedents are not sacrosanct." *Patterson v. McClean Credit Union*, 491 U.S. 164, 172 (1989); *Payne v. Tennessee*, 501 U.S. 808 (1991) ("Stare decisis is not an inexorable command; rather, it is a principle of policy and not a mechanical formula of adherence to the latest decision.").

In *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007), this Court rejected similar *stare decisis*, Congressional inactions, and reliance arguments that had constrained it in *Flood*. In *Leegin*, this Court overruled its earlier (96-year-old) antitrust decision in *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373 (1911) (that vertical resale price maintenance is subject to a per se antitrust analysis) and held that such vertical resale price maintenance is instead subject to "rule of reason" antitrust analysis. In refusing to be bound by *stare decisis* and Congress's 96- year inaction, this Court held at 899-907:

> *Stare decisis* not as significant in this case, however, because the issue before us is the scope of the Sherman Act. (Citation omitted). ("[T]he general presumption that legislative changes should be left to Congress has less force with respect to the Sherman Act"). From the beginning the Court has treated the Sherman Act as a common-law statute. (Citations omitted). ("In antitrust, the federal courts ... act more as common-law courts than in other areas governed by federal statute"). Just as the common law adapts to modern understanding and greater experience, so too does the Sherman Act's prohibition on "restraint[s] of trade" evolve to meet the dynamics of present economic conditions.
>
> …
>
> …"we have overruled our precedents when subsequent cases have undermined their doctrinal underpinnings."
>
> …
>
> …"our antitrust doctrines "evolv[e] with new circumstances and new wisdom." (Citation omitted). *Id.* at 905.
>
> …

Law Offices of Samuel Kornhauser
155 Jackson Street, Suite 1807
San Francisco, CA 94111

The same reasoning in not blindly applying outmoded, erroneous reasoning to an antitrust case applies (with even more force) here. As in *Leegin,* the precedent here is nearly 100 years old. The economic realities have changed greatly, and *Federal Baseball* does not further, but rather frustrates, the important goal of enforcing price fixing violations.

There is no valid economic reason to adhere to the old wrong law. Subsequent decisions, *Mackey v. National Football League*, 543 F.2d 606, 617 (8th Cir. 1976) and this Court's decisions in *Radovich v. National Football League,* supra, *United States v. Shubert*, 348 U.S. 222, 228 (1955), *United States v. Int'l Boxing Club of N.Y.*, 348 U.S. 236, 241-242 (1955), and *Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219 (1948) and others have proved the earlier baseball decision wrong. Here, as in *Leegin,* the prior baseball trilogy of case(s) conflict with subsequent Supreme Court precedent, i.e., antitrust laws have repeatedly been held to apply to invalidate horizontal conspiracies to restrain athletes' salaries, in football, hockey, basketball, etc. *Mackey,* supra, 543 F.2d at 617 and cases cited therein. Indeed, this Court's Justices (including Justice Douglas who voted with the majority in *Toolson* but lived to regret it) no longer believe in the reasoning of the "aberrant" *Federal Baseball* and its progeny. There is no reason to apply them.

Much has changed since the Supreme Court  decision in *Flood v. Kuhn* 407 US 258 (1972). In addition to the strong hint from the Supreme Court in *Alston*, Senators Dick Durbin and Bernie Sanders are proposing legislation to end the "business of baseball" exemption.

Four minor league teams have also filed suit to overturn the "business of

Law Offices of Samuel Kornhauser
155 Jackson Street, Suite 1807
San Francisco, CA 94111

baseball" exemption. *Nostalgic Partners, LLC v. The Office of the Commissioner of Baseball* (Case No. 1:21-cv-10876-ALC) (S. D. N. Y. 2021). The Department of Justice filed a Statement of Interest in that case stating, in part, that the "baseball exemption" is aberrational and rests on a repudiated commerce clause rationale. See Exhibit 1, p. 4 attached hereto.

It appears that the baseball exemption is about to strike out.

## VII.   DEFENDANTS' MOTION TO DISMISS SHOULD BE DENIED OR STAYED TO ALLOW PLAINTIFFS EXTENDED TIME TO FILE A FULL AND COMPLETE OPPOSITION, INCLUDING TIME TO CONDUCT LIMITED PERSONAL JURISDICTION DISCOVERY

Plaintiff should be permitted to conduct limited, general, and specific personal jurisdictional discovery. *Negron-Torrez v. Verizon Communications Inc.* 478 F.3d 19 (1st. Cir. 2007); *Adelson v. Hananel* 510 F.3d 43 (1st. Cir. 2007); In re Atrium Medical Corp.299 FSupp 324 (D. New Hampshire 2017) citing *Orion Seafood International, Inc. v. Supreme Group B.V.* 2012 WL 3776919 at*3 (11-civ-562, D. New Hampshire, August 29, 2012) Here, discovery is needed to obtain from Defendants the following categories of documents and information to establish general and/or specific personal jurisdiction:

Discovery regarding

each tender of Defendants' uniform minor league player contracts to residents of Puerto Rico,

each actual minor league contract with a resident of Puerto Rico,

each of Defendants' minor league drafts of residents of Puerto Rico,

each of Defendants' contract payments to each Puerto Rican minor league player,

all agreements among Defendants to impose uniform minor league player contracts that adopt, ratify, or require the seven-year reserve clause in minor league contracts,

all agreements or notification of the terms of the Major League Constitution, the Major League Rules, Uniform Minor League Player Contracts, and

Law Offices of Samuel Kornhauser
155 Jackson Street, Suite 1807
San Francisco, CA 94111

Defendants' agreements to or ratification of uniform annual compensation for minor leaguers at each tier (rookie, lower A, double a, etc.) of minor league baseball.

See Plaintiffs' Memorandum In Support of Motion For 1) Extension Of Time To File

Opposition To Defendants' Motion To Dismiss Plaintiffs' First Amended Complaint And  2)

Motion For Leave To Conduct Limited Jurisdictional Discovery To Oppose Defendants'

Motion To Dismiss Plaintiffs' First Amended Complaint (Docket No. 53)

Law Offices of Samuel Kornhauser
155 Jackson Street, Suite 1807
San Francisco, CA 94111

**CONCLUSION**

For the reasons set forth above, Defendants' Motion to Dismiss the First Amended Complaint should be denied. In the alternative, plaintiffs' pending motion for an extension of time to file their Opposition memorandum and to conduct limited jurisdictional discovery should be granted and this Court's decision on the Motion to Dismiss should be stayed until after jurisdictional discovery and final briefing is completed.

Plaintiffs also request oral argument so that they can have an opportunity to respond to arguments Defendants may make in their reply.

DATED: July 5, 2022                    LAW OFFICES OF SAMUEL KORNHAUSER

By:  /s/ Samuel Kornhauser
          Samuel Kornhauser (*pro hac vice*)

and

LAW OFFICES OF BRIAN DAVID

By:  /s/ Brian David
          Brian David (*pro hac vice*)

and

BAELLA & BAELLA

By:  /s/ Rafael Baella-Silva
          Rafael Baella-Silva

Attorneys for Plaintiff and
those similarly situated

**EXHIBIT 1**

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

NOSTALGIC PARTNERS, LLC, d/b/a
THE STATEN ISLAND YANKEES;
ONEONTA ATHLETIC CORPORATION,
d/b/a THE NORWICH SEA UNICORNS;
SPORTS ENTERPRISES, INC. d/b/a
SALEM-KEIZER VOLCANOES; and TRI-
CITY VALLEYCATS, INC.,

               Plaintiffs,

v.

THE OFFICE OF THE COMMISSIONER OF
BASEBALL, AN UNINCORPORATED
ASSOCIATION d/b/a MAJOR LEAGUE
BASEBALL

               Defendant.

Case No. 1:21-cv-10876-ALC

---

## STATEMENT OF INTEREST OF THE UNITED STATES

JONATHAN S. KANTER
*Assistant Attorney General*

DOHA G. MEKKI
*Principal Deputy Assistant Attorney General*

DAVID B. LAWRENCE
*Policy Director*

DANIEL S. GUARNERA
*Counsel to the Assistant Attorney General*

ERIC D. DUNN
*Attorney Advisor to the Assistant Attorney General*

DANIEL E. HAAR
NICKOLAI G. LEVIN
*Attorneys*

U.S. Department of Justice, Antitrust Division
950 Pennsylvania Avenue, NW, Room 3224
Washington, DC 20530
Telephone: 202-230-4106
E-mail: daniel.guarnera@usdoj.gov
*Attorneys for the United States of America*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ 1

INTEREST OF THE UNITED STATES ...................................................................................... 1

BACKGROUND .......................................................................................................................... 1

  I. Professional Baseball Is an Important Part of National and Local Economies ...................... 1

  II. Relevant Allegations and Procedural History ........................................................................ 3

ARGUMENT ................................................................................................................................ 4

  I. The "Baseball Exemption" Is Aberrational and Rests on a Repudiated Commerce Clause
     Rationale ................................................................................................................................... 4

  II. Lower Courts Should Interpret the "Baseball Exemption" Narrowly and Not Extend It
     Beyond the Scope Recognized by the Supreme Court ........................................................... 8

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Amateur Softball Ass'n of America v. United States*,
   467 F.2d 312 (10th Cir. 1972) ............................................................ 5

*American Needle, Inc. v. National Football League*,
   560 U.S. 183 (2010) ........................................................................... 2

*Boston Professional Hockey Ass'n v. Cheevers*,
   348 F. Supp. 261 (D. Mass. 1972) ..................................................... 5

*Brown v. Pro Football, Inc.*,
   518 U.S. 231 (1996) ........................................................................... 6

*Butterworth v. National League of Professional Baseball Clubs*,
   644 So. 2d 1021 (Fla. 1994) ............................................................ 10

*Federal Maritime Commission v. Seatrain Lines, Inc.*,
   411 U.S. 726 (1973) ........................................................................... 8

*Federal Baseball Club of Baltimore v. National League of Professional Baseball Clubs*,
   259 U.S. 200 (1922) ............................................................. 5, 6, 9, 10

*Fleer Corp. v. Topps Chewing Gum, Inc.*,
   658 F.2d 139 (3d Cir. 1981) ............................................................ 10

*Flood v. Kuhn*,
   407 U.S. 258 (1972) ................................................................... 5, 7, 9

*FTC v. Phoebe Putney Health System, Inc.*,
   568 U.S. 216 (2013) ........................................................................... 6

*FTC v. Ticor Title Insurance Co.*,
   504 U.S. 621 (1992) ........................................................................... 6

*Gardella v. Chandler*,
   172 F. 2d 402 (2d Cir. 1949) ............................................................. 8

*Group Life & Health Insurance Co. v. Royal Drug Co.*,
   440 U.S. 205 (1979) ...................................................................... 8, 11

*Henderson Broad. Corp. v. Houston Sports Ass'n, Inc.*,
   541 F. Supp. 263 (S.D. Tex. 1982) .................................................. 10

*Laumann v. National Hockey League*,
   56 F. Supp. 3d 280 (S.D.N.Y. 2014) ........................................... 8, 10

*Major League Baseball Properties, Inc. v. Salvino, Inc.*,
542 F.3d 290 (2d Cir. 2008) ............................................................................. 9

*NCAA v. Alston*,
141 S. Ct. 2141 (2021) ......................................................................... 1, 5, 6, 8

*Northern Pacific Railway Co. v. United States*,
356 U.S. 1 (1958) ...................................................................................... 2, 5

*Piazza v. Major League Baseball*,
831 F. Supp. 420 (E.D. Pa. 1993) ......................................................................... 10

*Pirone v. MacMillan, Inc.*,
894 F.2d 579 (2d Cir. 1990) ......................................................................... 1

*Postema v. National League of Professional Baseball Clubs*,
799 F. Supp. 1475 (S.D.N.Y. 1992) ......................................................................... 10

*Postema v. National League of Professional Baseball Clubs*,
998 F.2d 60 (2d Cir. 1993) ......................................................................... 10

*Radovich* v. *National Football League*,
352 U.S. 445 (1957) ......................................................................... 5, 6, 7

*Right Field Rooftops, LLC v. Chicago Cubs Baseball Club, LLC*,
870 F.3d 682 (7th Cir. 2017) ......................................................................... 9

*Salerno v. American League of Professional Baseball Clubs*,
429 F.2d 1003 (2d Cir. 1970) ......................................................................... 7

*SEC v. National Securities, Inc.*,
393 U.S. 453 (1969) ......................................................................... 11

*Standard Oil Co. v. FTC*,
340 U. S. 231 (1951) ......................................................................... 4

*Toolson v. New York Yankees, Inc.*,
346 U.S. 356 (1953) ......................................................................... passim

*United States v. International Boxing Club*,
348 U.S. 236 (1955) ......................................................................... 5, 7

*United States v. Topco Associates, Inc.*,
405 U.S. 596 (1972) ......................................................................... 5

*Washington Professional Basketball Corp. v. National Basketball Ass'n*,
147 F. Supp. 154 (S.D.N.Y. 1956) ......................................................................... 5

iv

**Statutes**

15 U.S.C. § 26b(a) ....................................................................................................... 7

15 U.S.C. § 1012 ........................................................................................................ 11

28 U.S.C. § 517 ............................................................................................................ 1

**Legislative Materials**

H.R. Res. 815, 116th Cong. (2020) ............................................................................... 2

**Other Authorities**

Nola Agha, *The Economic Impact of Stadia and Teams: The Case of Minor League Baseball*, 14 Journal of Sports Econonics 227 (2013) ............................................................................. 3

Nola Agha & Dennis Coates, *A Compensating Differential Approach to Valuing the Social Benefit of Minor League Baseball*, 33 Contemporary Economic Policy 285 (2015) ................. 2

Mike Ozanian & Justin Teitelbaum, *Baseball's Most Valuable Teams 2022*, Forbes (Mar. 24, 2022) ....................................................................................................................... 1, 2

## INTEREST OF THE UNITED STATES

The United States respectfully submits this statement pursuant to 28 U.S.C. § 517, which permits the Attorney General to direct any officer of the Department of Justice to attend to the interests of the United States in any case pending in federal or state court.  The Antitrust Division of the Department of Justice enforces the federal antitrust laws, including Section 1 of the Sherman Act, and has a strong interest in their correct application.  That is particularly true where parties seek special treatment under the antitrust laws as Defendant does here.

The United States takes no position on the ultimate disposition of Defendant's Motion to Dismiss ("MTD").  Instead, the United States addresses two issues.  First, the so-called "baseball exemption" is "aberrational," *NCAA v. Alston*, 141 S. Ct. 2141, 2159 (2021) (internal quotation marks and brackets omitted), and does not rest on any substantive policy interests that justify players and fans losing out on the benefits of competition.  Second, consistent with Supreme Court precedent and well-established principles governing the interpretation of antitrust exemptions, lower courts should limit the "baseball exemption" to conduct that is central to the business of offering professional baseball games to the public.

## BACKGROUND

### I.    Professional Baseball Is an Important Part of National and Local Economies

Baseball is America's "National Pastime," "central to our common American heritage," and "part of the national character."  *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 580 (2d Cir. 1990).  Players like Babe Ruth, Jackie Robinson, Roberto Clemente, and Hank Aaron have transcended the sport and left an indelible mark on our national culture.

Baseball is big business, too.  The average Major League Baseball team is worth over $2 billion dollars, up 9 percent since 2021.  Mike Ozanian & Justin Teitelbaum, *Baseball's Most*

1

*Valuable Teams 2022*, Forbes (Mar. 24, 2022),

https://www.forbes.com/sites/mikeozanian/%202022/03/24/baseballs-most-valuable-teams-2022-yankees-hit-6-billion-as-new-cba-creates-new-revenue-streams/.  Major League teams

compete not just to win championships, but to attract fans and earn revenue.  Compl. ¶¶ 76–79;

*see also Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 196–97 (2010) ("[T]eams

compete with one another, not only on the playing field, but to attract fans, for gate receipts, and

for contracts with managerial and playing personnel.").  This competition can generate

significant benefits for fans, players, and other trading partners, as it does in other areas of the

economy.  *See, e.g.*, *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958) ("[The Sherman Act]

rests on the premise that the unrestrained interaction of competitive forces will yield the best

allocation of our economic resources, the lowest prices, the highest quality and the greatest

material progress, while at the same time providing an environment conducive to the

preservation of our democratic political and social institutions.").

     Minor League Baseball also enjoys a special place in American culture.  For many

communities, Minor League Baseball is the only local professional sport available.  *See* Nola

Agha & Dennis Coates, *A Compensating Differential Approach to Valuing the Social Benefit of

Minor League Baseball*, 33 Contemp. Econ. Pol'y 285, 285 (2015).  In many more communities,

Minor League Baseball is a vital source of jobs, tourism, and affordable entertainment.  For

example, Plaintiffs estimate that the Tri-City Valley Cats, previously a Single-A affiliate of the

Houston Astros, provided Troy, New York with about "$55 million in beneficial economic

impacts from one year of operations" and supported 763 local jobs.  Compl. ¶ 73; *see also* H.R.

Res. 815, 116th Cong. (2020) ("[T]he economic stimulus and development provided by Minor

League Baseball clubs extends beyond the cities and towns where it is played, to wide and

diverse geographic areas comprising 80 percent of the population in the Nation."). Other studies show that the presence of a Minor League team is associated with "significant positive effects" on local per capita income in hundreds of communities across the country. *See* Nola Agha, *The Economic Impact of Stadia and Teams: The Case of Minor League Baseball*, 14 J. Sports Econ. 227, 227 (2013). Eliminating Minor League teams can therefore have wide-ranging effects on fans, players, and communities throughout the United States.

## II.     Relevant Allegations and Procedural History

For many years, the relationship between Major League teams and Minor League teams was governed by the Professional Baseball Agreement. Compl. ¶ 49. Under this system, individual Major League teams competed to "affiliate" with individual Minor League teams, and individual Minor League teams competed for affiliations with individual Major League teams. *Id.* ¶¶ 49-53. Major League teams covered certain expenses for their Minor League affiliates in exchange for revenue sharing and talent development. *Id.* When the Professional Baseball Agreement expired in 2020, however, Defendant and the Major League teams "jointly agreed to implement a new minor league system" called the "Professional Development League." *Id.* ¶ 60; MTD at 5. In this new system, the total number of Minor League affiliates was reduced from 160 under the Professional Baseball Agreement (six per Major League team) to 120 (four per Major League team). Compl. ¶ 2; MTD at 5.

Plaintiffs are a group of former affiliates of Major League teams. They allege that the Professional Development League involves a horizontal group boycott among Major League teams against the 40 "Ousted Teams," including Plaintiffs, which can no longer compete to affiliate with Major League teams or even play against their affiliates. Compl. ¶ 111. Plaintiffs also allege that the Professional Development League involves a horizontal agreement among

3

Major League teams "that has artificially reduced and capped output" of affiliations below the level "that would otherwise occur in an unconstrained market." *Id.* As a result of this agreement, Plaintiffs aver that "fans, sponsors, and communities" have been "deprived of the MLB-affiliated product that would have been offered to them if competition had not been restrained." *Id.* ¶ 73. Plaintiffs seek damages, fees, and an injunction that would "permit [Major League] Clubs to compete with each other to make their own decisions as to with which MiLB teams—and how many—to affiliate." *Id.* (Prayer for Relief).

Major League Baseball has moved to dismiss on three grounds: lack of antitrust standing, failure to plead a Sherman Act violation, and baseball's "exemption" from the antitrust laws. MTD 1-3. Plaintiffs dispute the first two grounds for dismissal, and the United States expresses no views on them here. As for the exemption, "Plaintiffs recognize that [this] Court is currently bound by th[e] exemption and will need to dismiss on that basis." Plaintiffs' Opp'n to Def.'s Mot. to Dismiss, Dkt. 31, at 3 (May 27, 2022).

## ARGUMENT

The "baseball exemption" is a recurring source of litigation. Therefore, the United States seeks to set forth its views on the proper scope of the exemption, focusing on two broader points of law. First, the Supreme Court has repudiated the original Commerce Clause justification for the "baseball exemption," leaving it as an aberration with respect to other sports and other antitrust exemptions. Second, for those reasons, among others, lower courts should not expand the "baseball exemption" beyond the scope established by the Supreme Court.

### I.    The "Baseball Exemption" Is Aberrational and Rests on a Repudiated Commerce Clause Rationale

Baseball may be our national pastime, but "our national economic policy long has been faith in the value of competition." *Standard Oil Co. v. FTC*, 340 U. S. 231, 248 (1951). The

Sherman Act is "a comprehensive charter of economic liberty aimed at preserving free and unfettered competition," *N. Pac. Ry. Co.*, 356 U.S. at 4, and "as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms," *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972); *see also Alston*, 141 S. Ct. at 2147 ("In the Sherman Act, Congress tasked courts with enforcing a policy of competition on the belief that market forces yield the best allocation of the Nation's resources." (internal quotation marks omitted)).

The "baseball exemption" established in *Federal Baseball Club of Baltimore v. National League of Professional Baseball Clubs*, 259 U.S. 200 (1922), is a judicially created exception to this national economic policy established by Congress.  The Supreme Court has itself recognized the exemption as "an exception and an anomaly" and "an aberration confined to baseball." *Flood v. Kuhn*, 407 U.S. 258, 282 (1972).  Just last year, the Court acknowledged that although it "once dallied with something that looks a bit like an antitrust exemption for professional baseball," it "has refused to extend *Federal Baseball*'s reasoning to other sports leagues." *Alston*, 141 S. Ct. at 2159; *id.* (citing the amicus brief for Advocates for Minor Leaguers, which "gather[ed] criticisms" of the exemption).  Accordingly, the Court has expressly declined to create similar exemptions for boxing, *United States v. Int'l Boxing Club*, 348 U.S. 236, 244-45 (1955), and football, *Radovich v. Nat'l Football League*, 352 U.S. 445, 450 (1957).  Lower courts have likewise refused to recognize exemptions for other sports leagues. *See, e.g.*, *Amateur Softball Ass'n of Am. v. United States*, 467 F.2d 312, 314 (10th Cir. 1972) (amateur softball); *Bos. Prof'l Hockey Ass'n v. Cheevers*, 348 F. Supp. 261, 265 (D. Mass. 1972) (ice hockey); *Washington Prof'l Basketball Corp. v. Nat'l Basketball Ass'n*, 147 F. Supp. 154, 155 (S.D.N.Y. 1956) (basketball).

Indeed, the Supreme Court recognized as far back as 1957 that "were [it] considering the question of baseball for the first time upon a clean slate" it would have decided the question differently. *Radovich*, 352 U.S. at 452. Because of the exemption's anomalous foundations, the Supreme Court has "limit[ed] the rule [] established [in *Federal Baseball*] to the facts there involved, i.e., the business of organized professional baseball." *Id.* at 451.

In addition to being unique among sports leagues, the "baseball exemption" is also distinct among antitrust exemptions in that it was not created to reconcile competing legal authorities or substantive policy goals. For example, the "state-action doctrine" exempts certain actions taken by state governments from the scope of the federal antitrust laws. The Supreme Court has explained that "nothing in the language of the Sherman Act or in its history suggested that Congress intended to restrict the sovereign capacity of the States to regulate their economies," *FTC v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 224-25 (2013) (internal quotation marks omitted), and thus the state-action doctrine is intended "to foster and preserve the federal system," *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 633 (1992). Similarly, the "nonstatutory labor exemption" immunizes certain activity from the Sherman Act to "accommodate[e] . . . the congressional policy favoring collective bargaining." *Brown v. Pro Football, Inc.*, 518 U.S. 231, 254 (1996).

By contrast, the "baseball exemption" rests on a repudiated Commerce Clause rationale. In *Federal Baseball*, the Supreme Court concluded that "[t]he business [of] giving exhibitions of base ball" involved "purely state affairs" and therefore did not satisfy the interstate-commerce element of the Sherman Act.[1] 259 U.S. at 208-09. In *Toolson v. N.Y. Yankees, Inc.*, 346 U.S.

---

[1] The Supreme Court has suggested that *Federal Baseball*'s Commerce Clause analysis was dubious at the time the case was decided. *See Alston*, 141 S. Ct. at 2159 ("[T]he Court [in

356 (1953), the Court "was asked to overrule [*Federal Baseball*] on the ground that it was out of step with subsequent decisions reflecting present-day concepts of interstate commerce." *Flood*, 407 U.S. at 275. *Toolson* ultimately upheld *Federal Baseball* on "a narrow application of the rule of stare decisis" and "[w]ithout re-examination of the underlying issues." *Id.* at 276. But the Court went further in *Flood* and flatly proclaimed that "[p]rofessional baseball is a business and it is engaged in interstate commerce." *Id.* at 282. Nonetheless, the Court "adhere[d] once again to *Federal Baseball* and *Toolson* and to their application to professional baseball" in light of stare decisis and Congress's "positive inaction." *Id.* at 283-84; *see also id*. at 284 ("Under these circumstances, there is merit in consistency even though some might claim that beneath that consistency is a layer of inconsistency.").

*Flood* also mentioned that the "baseball exemption" "rests on a recognition and an acceptance of baseball's unique characteristics and needs." *Id*. at 282. But *Flood* did not identify what these "unique characteristics and needs" are—*Federal Baseball* and *Toolson* did not discuss baseball's "uniqueness" either—or what distinguishes baseball from other sports for which the Court has declined to create similar exemptions.[2] *See, e.g.*, *Int'l Boxing Club*, 348 U.S. at 244-45; *Radovich*, 352 U.S. at 450.

---

*Federal Baseball*] reasoned that 'exhibitions' of 'base ball' did not implicate the Sherman Act because they did not involve interstate trade or commerce—even though teams regularly crossed state lines (as they do today) to make money and enhance their commercial success." (citation omitted)); *see also Salerno v. Am. League of Prof'l Baseball Clubs*, 429 F.2d 1003, 1005 (2d Cir. 1970) (Friendly, J.) ("[w]e freely acknowledge our belief that *Federal Baseball* was not one of Mr. Justice Holmes' happiest days").

[2] To the extent the Court was referencing the "reserve system" at issue in *Flood* itself, 407 U.S. at 282, that justification for the exemption was significantly undermined by the use of collective bargaining agreements and Congress's enactment of the Curt Flood Act of 1998, 15 U.S.C. § 26b(a), which subjected the reserve system to the antitrust laws.

Thus, today, the "baseball exemption" that was born from *Federal Baseball*'s interstate-commerce analysis persists as a freestanding exemption despite *Flood*'s repudiation of its original rationale. *Accord Gardella v. Chandler*, 172 F. 2d 402, 408-09 (2d Cir. 1949) (Frank, J., concurring) ("No one can treat as frivolous the argument that the Supreme Court's recent decisions have completely destroyed the vitality of [*Federal Baseball*] decided twenty-seven years ago, and have left that case but an impotent zombi.").

## II.     Lower Courts Should Interpret the "Baseball Exemption" Narrowly and Not Extend It Beyond the Scope Recognized by the Supreme Court

While *Federal Baseball* and its progeny remain binding precedent, lower courts should narrowly construe the judicially created exemption for the "business of baseball," *Toolson*, 346 U.S. at 357, and should not extend its scope beyond what the Supreme Court has articulated— conduct that is central to providing professional baseball games to the public.

The Supreme Court has repeatedly emphasized that exemptions from the antitrust laws should be "strictly construed." *Fed. Mar. Comm'n v. Seatrain Lines, Inc.*, 411 U.S. 726, 733 (1973) ("a broad reading . . . would conflict with our frequently expressed view that exemptions from antitrust laws are strictly construed"). That is true whether immunity is established by Congress or implied by courts. *See, e.g.*, *Grp. Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 231 (1979) (the "well settled" principle "that exemptions from the antitrust laws are to be narrowly construed . . . is not limited to implicit exemptions from the antitrust laws, but applies with equal force to express statutory exemptions"). After all, "[i]n the Sherman Act, Congress tasked courts with enforcing a policy of competition." *Alston*, 141 S. Ct. at 2147. These principles apply with special force here given the aberrational nature of the "baseball exemption," as discussed above. *See Laumann v. Nat'l Hockey League*, 56 F. Supp. 3d 280, 297 (S.D.N.Y. 2014) (recognizing that "[e]xceptions to the antitrust laws are to be construed

8

narrowly," and, "[m]oreover, the Supreme Court has expressly questioned the validity and logic of the baseball exemption and declined to extend it to other sports").

In that light lower courts should not extend the "baseball exemption" beyond the scope recognized by the Supreme Court in its baseball "trilogy," which limited the exemption to conduct that is central to the actual exhibition of professional baseball games.  In *Federal Baseball*, the Court identified "[t]he business" at issue as "giving exhibitions of base ball."  259 U.S. at 208.  Indeed, the distinction the Court drew between exhibitions (games) and activity "incident" to the exhibitions, such as the teams' travel, was central to the Court's reasoning. "[O]ne or the other club cross[ed] a state line in order to make the meeting possible," the Court acknowledged, but the games themselves—the "business" in dispute—were "purely state affairs" and thus outside the scope of the Commerce Clause (as interpreted in *Federal Baseball*).  *Id.* *Toolson* likewise characterized the scope of *Federal Baseball*'s holding as "the business of *providing public baseball games for profit* between clubs of professional baseball players."  346 U.S. at 357 (emphasis added).  And *Flood*, in which only the reserve clause was at issue, merely "adhere[d]" to these earlier cases.  407 U.S. at 277.[3]

Moreover, while *Flood* accepted that "baseball's unique characteristics and needs" justified retaining *Federal Baseball*'s exemption, 407 U.S. at 282, that justification "suggest[ed]

---

[3] In *Right Field Rooftops, LLC v. Chicago Cubs Baseball Club, LLC*, 870 F.3d 682 (7th Cir. 2017), the court concluded that the Chicago Cubs' attempt to set minimum prices for seating on rooftops adjacent to Wrigley Field was "part and parcel" of "providing public baseball games for profit."  *Id.* at 689.  That "part and parcel" standard, at least as applied in *Right Field Rooftops*, extends the exemption far beyond conduct central to offering public baseball games, since games can readily be held without teams' control over the pricing of seating outside their stadiums. Under that standard, a baseball team could argue that an agreement related to selling team merchandise is "part and parcel" to the business of baseball.  *Cf. Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008) (applying the Sherman Act to an antitrust challenge to licenses of intellectual property involving Major League Baseball teams).

that baseball might not be exempt from liability for conduct *not* touching on those characteristics or needs," *Postema v. Nat'l League of Prof'l Baseball Clubs*, 799 F. Supp. 1475, 1488 (S.D.N.Y. 1992) (emphasis added), *rev'd in irrelevant part*, 998 F.2d 60 (2d Cir. 1993).  Courts have therefore found that conduct "not central to the business of baseball" falls outside the exemption. *Laumann*, 56 F. Supp. 3d at 297 (analyzing the exemption in a challenge to broadcasting contracts with professional hockey and baseball teams).  Thus, while the exemption may cover "antitrust challenges to [Major League Baseball's] league structure and its reserve system," *Postema*, 799 F. Supp. at 1489, it would *not* cover conduct beyond the scope of the offering of exhibitions of professional baseball.[4]  Such conduct would include agreements between baseball teams and baseball card manufacturers to fix the prices at which cards are sold to consumers, *cf. Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139 (3d Cir. 1981) (analyzing whether agreements between the Major League Baseball Players Association and trading card companies violated the Sherman Act without discussing the "baseball exemption"), or restraints on broadcasting baseball games, *see Henderson Broad. Corp. v. Houston Sports Ass'n, Inc.*, 541 F. Supp. 263, 265 (S.D. Tex. 1982) ("broadcasting is not central enough to baseball to be encompassed in the baseball exemption").[5]

---

[4] Conduct is not necessarily exempt just because it occurs during or incident to games.  *See supra* note 3.

[5] A few courts have interpreted the "baseball exemption" to be limited to the reserve clause rather than providing professional baseball games to the public.  For example, *Piazza v. Major League Baseball*, 831 F. Supp. 420, 4536 (E.D. Pa. 1993), noted that "*Flood* refers to the reserve clause at least *four* times," *id*. at 437, and concluded that "*Flood v. Kuhn* stripped from *Federal Baseball* and *Toolson* any precedential value those cases may have had beyond the particular facts there involved, *i.e.*, the reserve clause," *id*. at 436; *see also Butterworth v. Nat'l League of Prof'l Baseball Clubs*, 644 So. 2d 1021, 1024 (Fla. 1994) (similar).  *Piazza*'s conclusion regarding the exemption's scope does not follow, however, because *Federal Baseball* and *Toolson* both involved allegedly anticompetitive conduct in addition to the reserve clause.  *See, e.g.*, *Federal Baseball*, 259 U.S. at 207 (describing plaintiff's allegations that "defendants

10

Finally, precedent applying the McCarran-Ferguson Act's statutory exemption for the "business of insurance" is instructive. *See* 15 U.S.C. § 1012. The Supreme Court explained that it would be "plainly contrary to the statutory language" to read the exemption as applying broadly to the "business of insurance companies" rather than the narrower concept in the text— "the business of insurance." *Royal Drug*, 440 U.S. at 216-17. Similarly, courts should not interpret the scope of the "business of baseball" exemption to cover any business that baseball organizations are involved in. In *SEC v. National Securities, Inc.*, 393 U.S. 453 (1969), the Supreme Court explained that the "business of insurance" exemption reached only "core" aspects of the relationship between an insurance company and a policy holder—*e.g.*, "the type of policy which could be issued, its reliability, interpretation, and enforcement"—not every kind of agreement between an insurance company and any of its trading partners. 393 U.S. at 468. The "business of baseball" should likewise be interpreted to cover only the core aspects of professional baseball—which, in light of *Federal Baseball*, means conduct closely tied to the public exhibition of professional baseball games.

To the extent the Court analyzes the scope of the "baseball exemption," the United States respectfully requests that the Court define the exemption narrowly and decline to extend its scope beyond conduct that is central to the offering of professional baseball exhibitions.

---

destroyed the Federal League by buying up some of the constituent clubs and in one way or another inducing all those clubs except the plaintiff to leave their League"); *Toolson*, 346 U.S. at 361 n.10 (Burton, J., dissenting) (referencing plaintiffs' allegation that "the defendants have, by their agreements, combined to monopolize professional baseball in the United States").

Respectfully submitted,

JONATHAN S. KANTER
*Assistant Attorney General*

DOHA G. MEKKI
*Principal Deputy Assistant Attorney General*

DAVID B. LAWRENCE
*Policy Director*

DANIEL S. GUARNERA
*Counsel to the Assistant Attorney General*

ERIC D. DUNN
*Attorney Advisor to the Assistant Attorney General*

DANIEL E. HAAR
NICKOLAI G. LEVIN
*Attorneys*


/s/ Daniel S. Guarnera
DANIEL S. GUARNERA
U.S. Department of Justice
Antitrust Division
950 Pennsylvania Avenue NW
Washington, DC 20530

12

**CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of June, 2021, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system, which sent a notification of such filing to all

counsel of record in this matter.

/s/ Daniel S. Guarnera
DANIEL S. GUARNERA
U.S. Department of Justice
Antitrust Division
950 Pennsylvania Avenue NW
Washington, DC 20530

**CERTIFICATE OF SERVICE**


The undersigned hereby certifies that a true and correct copy of the forgoing

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST**

**AMENDED COMPLAINT (DOCKET NO. 35)** has been filed electronically with the U.S.

District Court, District of Puerto Rico this 5th day of July 2022. Notice of this filing will be

sent to all parties of record by operation of the Court's electronic filing system.


By:  /s/ Samuel Rolnick
Samuel Rolnick